**2021 IL 125644**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125644)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
BRIAN BIRGE, Appellant.

*Opinion filed February 19, 2021.*

JUSTICE MICHAEL J. BURKE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Overstreet, and Carter concurred in the judgment and opinion.

Justice Neville dissented, with opinion.

**OPINION**

¶ 1 Following a jury trial, defendant Brian Birge was convicted of burglary (720 ILCS 5/19-1(a), (b) (West 2014)) and arson (*id.* § 20-1(a)(1), (c)), both Class 2 felonies carrying mandatory class X sentencing based on defendant's criminal

history (730 ILCS 5/5-4.5-95(b) (West 2014)). The Livingston County circuit court sentenced defendant to 24 years and 6 months' imprisonment on each count, to be served concurrently, and further ordered defendant to pay the victim $117,230 in restitution. Defendant appealed, arguing, *inter alia*, that (1) the trial court failed to properly admonish the jurors in accordance with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (2) contrary to the statutory requirement, the restitution order lacked a sufficient evidentiary basis for the amount imposed (730 ILCS 5/5-5-6(f) (West 2014)), and (3) defense counsel was ineffective in failing to object to the restitution order. The appellate court affirmed defendant's convictions and rejected his restitution argument. 2019 IL App (4th) 170341-U.

¶ 2 We allowed defendant's petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2019). For the following reasons, we hold that the jurors were correctly admonished pursuant to Rule 431(b). The restitution order, however, was erroneously entered due to the lack of a sufficient evidentiary basis, which thereby affected the integrity of the judicial process and the fairness of the restitution portion of the sentencing proceeding. Accordingly, we affirm the portion of the appellate court's judgment that affirmed defendant's convictions. But we vacate the restitution portion of the circuit court's sentencing order and remand for a new hearing on that matter.

¶ 3          BACKGROUND

¶ 4 In February 2017, the case against defendant proceeded to a jury trial on the charges of burglary and arson. During *voir dire*, the trial court separated the venire into two groups of 16 each. It admonished the first group regarding the principles enumerated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) as follows:

 "THE COURT: This is a criminal case as I mentioned. The defendant is presumed innocent. There are a number of propositions of law that you must be willing to follow if you are going to serve as a juror in this case. So I am going to recite those for you now. Please listen carefully as I will be asking if you understand these principles of law and if you accept these principles of law.

A person accused of a crime is presumed to be innocent of the charge against him. The fact that a charge has been made is not to be considered as any evidence or presumption of guilt against the Defendant.

The presumption of innocence stays with the Defendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved the Defendant's guilt beyond a reasonable doubt.

The State has the burden of proving the Defendant's guilt beyond a reasonable doubt. The defendant does not have to prove his innocence. The Defendant does not have to present any evidence on his own behalf and does not have to testify if he does not wish to. If the Defendant does not testify, that fact must not be considered by you in any way in arriving at your verdict.

So by a show of hands, do each of you understand these principles of law?

PROSPECTIVE JURORS: (All hands raised.)

THE COURT: Okay. And do each of you accept these principles of law?

PROSPECTIVE JURORS: (All hands raised.)"

¶ 5        Defense counsel also questioned these same prospective jurors, asking whether they understood that defendant is presumed innocent and that the State had to prove defendant guilty beyond a reasonable doubt. All potential jurors raised their hands, indicating that they understood those principles. Nine jurors were selected from this first group.

¶ 6        The court then brought in a second group of 16 prospective jurors and admonished them in the same manner as it did the first group. It again asked, "By a show of hands, do each of you understand these principles of law?" All 16 of these venire members raised their hands. The court next asked, "Do each of you accept these principles of law?" All 16 venire members raised their hands again. When defense counsel questioned these prospective jurors, he too asked if they understood that defendant is presumed innocent and that the State must prove defendant guilty beyond a reasonable doubt. All 16 raised their hands to indicate that they understood those principles. From this group, three jurors and one alternate were selected. And the case proceeded to trial.

¶ 7        Pontiac police sergeant Brad Baird testified at trial that he was on routine patrol on May 28, 2016, around 1:30 a.m., when he was flagged down by Willie Williams, who reported that a nearby store known as Chief City Vapor was on fire. Sergeant Baird went to the location and noticed that smoke and flames were coming from the building, the door was ajar, and broken glass lay scattered on the floor of the entryway. Nobody was in the building at the time. A trail of merchandise outside the store led to the southeast of the building, where there where several boxes with hundreds of items.

¶ 8        Officer Jonathan Marion testified that he was on duty at the time in question when he responded to a report from Sergeant Baird of a structure on fire at Chief City Vapor. Officer Marion arrived at the scene and saw heavy smoke and flames showing from inside the building. Officer Marion testified that Sergeant Baird, another officer, and the person who had flagged down Baird on the street were already at the scene when Marion arrived. The only other person in the vicinity was defendant, who was one block south of Chief City Vapor. Officer Marion approached defendant and noticed that he appeared nervous and was sweating profusely. Blood was dripping from his hand. Defendant told Marion that he cut his hand while working on a lawn mower. Marion testified that defendant was wearing shorts, a coat, and a hoodie. Glass shards and plastic tags were stuck to his clothing and legs. Defendant consented to a search of his person. Officer Marion recovered two pairs of pliers, a large amount of change, a set of keys, a lighter, and $115 in cash. Three of the keys recovered from defendant were for opening the locks for storage units on the property of Chief City Vapor.

¶ 9        Detective Michael Henson testified that he investigated the Chief City Vapor burglary after the fire was extinguished. Several stacks of clear plastic tags that read "sealed for your protection" were strewn about, both inside and outside the store. The tags were just like the ones that Officer Marion had recovered from defendant's person. Henson also received keys recovered from defendant and learned that they opened an exterior garage and storage unit connected to Chief City Vapor. Finally, Henson testified that the store's video surveillance system was badly damaged in the fire and that he was therefore unable to obtain any video of the crime. He decided against making further efforts to obtain surveillance video of the incident because the recovery attempt would be both costly and unlikely to be successful.

¶ 10    Tom Roe testified he owned the business known as Chief City Vapor but that his father owned the building that the business was located in. Roe did not give anyone permission to enter the building after the store closed on the night of the fire. Roe kept some change and approximately $100 in cash in the store's cash register. The keys discovered on defendant's person unlocked the outbuildings on the property and were always kept in Roe's desk, located inside the building. The trail of items found outside the building were the property of his business. That included the clear plastic tags (which were stored on shelves and used to seal bottles of vaping liquid). When asked about the damage the fire caused, Roe testified that he "had to gut the entire building down to pulling studs, pulling insulation, furnace." He further stated that "everything was lost," including the merchandise and furniture.

¶ 11    Shane Arndt, an arson investigator, testified that the Chief City Vapor fire was caused by someone introducing an open flame to the couch inside the store. He ruled out any accidental ignition source, such as faulty wiring or a furnace. The only potential source he could not rule out was the possibility that the disposable lighter recovered from defendant had been used to set the fire. He also testified that the glass door to the business was broken prior to the fire because the shattered glass on the floor did not have any smoke damage.

¶ 12    Defendant testified that he had overdosed on drugs approximately 12 hours prior to the fire and had been hospitalized. After discharge, defendant's mother dropped him off at "Aly Anne's" gambling parlor, which was located close to where Officer Marion later questioned defendant. Defendant testified that he did not remember many of the details from the relevant time because he was heavily medicated, drinking, and using drugs. He remembered leaving the gambling parlor and walking to his sister's house. Defendant knocked on the door, but his sister did not answer, so he decided to return to Aly Anne's to continue gambling. On his walk back, he observed some "commotion" and people running back and forth from a vehicle parked near Chief City Vapor. He watched as they drove away. Defendant then noticed stuff scattered outside. One of the items was a jacket, which he put on. He went through the pockets of the jacket and cut his hand on glass.

¶ 13    Defendant further testified that he remembered talking to Officer Marion "a little bit" but did not recall discussing the cut on his hand. Defendant denied any involvement with the fire and testified that he never set foot on the property.

¶ 14    The jury found defendant guilty of both charges. At the sentencing hearing, a presentence investigation report (PSI) was admitted without objection. It showed defendant had four prior felony convictions—aggravated criminal sexual abuse, residential burglary, unlawful possession of a controlled substance, and theft. Defendant reported no physical or mental health issues but did report a history of substance abuse. The PSI recommended that the trial court order defendant to pay restitution to the victim. Although a letter had been sent to the victim requesting information about restitution, the victim did not respond. The PSI noted that defendant may have difficulty paying restitution.

¶ 15    The trial court sentenced defendant on both counts to 24 years and 6 months' imprisonment, with the sentences to run concurrently. The court also ordered defendant to pay $117,230 in restitution. The restitution order stated as follows: "Defendant shall pay all said restitution *** in any event within five (5) years after this date, and as follows: *** full payment within 12 months after defendant's release from imprisonment in this case."

¶ 16    Defendant appealed, arguing that the circuit court's Rule 431(b) admonishments, which grouped the principles enunciated in the rule into one statement, constituted plain error. He maintained that the court should have recited each of the four principles in the rule individually and asked the venire members if they understood and accepted each principle after each was recited. He also argued that the circuit court erred in ordering restitution without sufficient evidentiary support or, in the alternative, that his trial counsel was ineffective for failing to object to the State's recommended restitution order. Defendant conceded before the appellate court that he did not object to the Rule 431(b) admonishments or the restitution order and, further, that he failed to raise the issues in a posttrial motion, but he asked the court to nevertheless consider these arguments under the plain-error doctrine.

¶ 17    In response, the State argued that Rule 431(b) does not require the court to recite each principle separately and consequently no error, much less plain error,

occurred. The State, however, conceded that the case should be remanded to the circuit court for a new hearing to substantiate the amount of restitution ordered.

¶ 18 The appellate court agreed defendant forfeited his claims; it then reviewed them for plain error. 2019 IL App (4th) 170341-U, ¶¶ 28, 57. With respect to the Rule 431(b) admonishments, it found that no clear or obvious error occurred because the circuit court's admonishments satisfied the requirements of the rule. *Id.* ¶¶ 32, 34. It concluded that the circuit court complied with the " 'specific question and response' " process outlined in *People v. Thompson*, 238 Ill. 2d 598, 607 (2010), and *People v. Curry*, 2013 IL App (4th) 120724, ¶ 65 (which recommended first reading verbatim all four principles to the venire members and then confirming that they understood and accepted those principles). 2019 IL App (4th) 170341-U, ¶¶ 31-32 (quoting *Thompson*, 238 Ill. 2d at 607).

¶ 19 The appellate court also rejected defendant's request to excuse his forfeiture of the restitution argument as second-prong plain error. *Id.* ¶ 60. It found that the alleged error—the lack of some receipt or testimony in the record proving the restitution amount—was not sufficiently grave that it denied defendant a fair trial. *Id.* The appellate court also found that defendant's ineffective assistance of counsel claim failed. *Id.* ¶ 55. Even assuming counsel's performance was deficient, defendant could not demonstrate prejudice—the appellate court reasoned—where defendant failed to allege that the amount of restitution was incorrect or that the outcome of the sentencing hearing would have been any different had counsel objected to the restitution order, especially in light of the victim's testimony that he had to " 'gut the entire building' and 'everything was lost' in the fire." *Id.*

¶ 20 As noted above, we granted defendant's petition for leave to appeal.

¶ 21 ANALYSIS

¶ 22 I. Admonishments Under Rule 431(b)

¶ 23 Before this court, defendant first argues that the trial court erred in admonishing the venire under Rule 431(b) because, by grouping the principles into one broad statement of law, the court failed to ensure that the potential jurors understood and accepted each of the four distinct concepts enumerated in the rule. Defendant

concedes that he forfeited this argument by failing to object at trial and by failing to raise the alleged error in a posttrial motion but asks this court to review it under the first prong of the plain-error doctrine.

¶ 24     It is well settled that, under the plain-error doctrine, a reviewing court may consider an unpreserved error if (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 564-65 (2007). Under either prong, the defendant bears the burden of persuasion. *Thompson*, 238 Ill. 2d at 613. However, a violation of Rule 431(b) is not a second-prong, structural error that requires automatic reversal under a plain-error analysis. *Id.* at 608, 611 (decided under amended version of Rule 431(b)); *People v. Glasper*, 234 Ill. 2d 173, 199-200 (2009) (decided under preamendment version of the rule). The first step under either prong of the plain-error doctrine in a case involving an alleged Rule 431(b) violation is to assess if a clear or obvious error occurred (*People v. Sebby*, 2017 IL 119445, ¶ 49), and our review of the matter is *de novo* (*People v. Downs*, 2015 IL 117934, ¶ 15).

¶ 25     Determining whether the circuit court erred by reciting all four Rule 431(b) principles together to the group of prospective jurors requires this court to construe the rule. See *Thompson*, 238 Ill. 2d at 606. The same well-settled canons of statutory construction that are employed for interpreting statutes apply as well when a reviewing court is tasked with construing Illinois Supreme Court rules. *Id.* As always, the chief objective of this court is to ascertain and give effect to the intent of the drafters. *Id.* The best indication of that intent is the language of the rule itself, giving it its plain and ordinary meaning. When the plain language of the rule is unambiguous, it will be applied as written without resort to any other aids of construction. *Id.*

¶ 26     Rule 431(b) states as follows:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that

before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 27 Here, the circuit court read the specific principles set forth in the rule verbatim to the prospective jurors and asked the specific questions required by the rule. Each of the prospective jurors indicated that they understood and accepted those principles by a show of hands. The rule plainly states that the court can ask the questions to the potential jurors as a group, and the rule does not require that their response be conveyed orally rather than by a show of hands. We believe that the procedure followed by the circuit court was all that was required by the plain language of the rule, and we therefore find that defendant's argument must be rejected.

¶ 28 This conclusion is consistent with the committee comments to the rule and our case law on the subject. The committee comments state that the intent of the rule is "to ensure compliance with the requirements of *People v. Zehr*, 103 Ill. 2d 472 (1984)." Ill. S. Ct. R. 431(b), Committee Comments. The comments further state that the rule "seeks to end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." *Id.*

¶ 29 In *Zehr*, this court observed the following:

"[E]ssential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an

instruction given at the end of the trial will have little curative effect." *People v. Zehr*, 103 Ill. 2d 472, 477 (1984).

¶ 30 After setting forth the above-mentioned precepts, the *Zehr* court found that it was error *not to submit* to the prospective jurors the questions tendered by defense counsel during *voir dire* about these principles. *Id.* at 477-78. It was not enough that the potential jurors were generally "asked whether they would follow the law as given them by the court even though they might personally disagree with it and whether any reason, moral, religious or otherwise, would prevent their being fair and impartial." *Id.* at 477.

¶ 31 The holding in *Zehr* was subsequently codified in our Rule 431(b). See *Thompson*, 238 Ill. 2d at 617 (Burke, J., dissenting, joined by Freeman, J.). As originally adopted, Rule 431(b) required the trial court to ask the *Zehr* questions only upon a request by the defendant. *Id.* at 617-18. This court, however, amended the rule in 2007 to impose an affirmative duty on trial courts to *sua sponte* ask potential jurors whether they "understood and accepted the principles." *Id.* at 618 (citing Ill. S. Ct. R. 431(b) (eff. May 1, 2007)).

¶ 32 In *Thompson*, this court had the opportunity to address a violation of the same amended version of Rule 431(b) that is at issue in the present case. The trial court in *Thompson* did not ask any of the prospective jurors whether they "accepted" the principle set forth in the rule dealing with the presumption of innocence. *Id.* at 607 (majority opinion). And, "[m]ost notably, the trial court did not question any of the prospective jurors on the third principle, whether they understood and accepted that defendant was not required to produce any evidence on his behalf." *Id.* This court found that "[t]he failure to address the third principle, by itself, constitutes noncompliance with the rule." *Id.*

¶ 33 *Thompson* construed Rule 431(b) to mandate a "specific question and response process." *Id.* "The trial court must ask each potential juror whether he or she *understands and accepts* each of the principles in the rule." (Emphasis added.) *Id.* Additionally, "the rule requires an opportunity for *a response* from each prospective juror on their understanding and acceptance of those principles." (Emphasis added.) *Id.*

¶ 34     Defendant relies upon *Thompson* in support of his position. But neither *Thompson* nor any other case decided by this court has held that the trial court must recite the principles *separately* to the prospective jurors, and the plain language of the rule, as we have already noted, does not require the court to explain the principles to the jurors in any particular fashion. Under the plain language, a court complies with Rule 431(b) if it (1) instructs the prospective jurors on the four principles, (2) asks if the prospective jurors understand those principles, and (3) asks if the prospective jurors accept those principles. Again, there is no requirement that the trial court recite the four principles separately.

¶ 35     Our construction of the rule is consistent with the appellate court decisions addressing the issue. All agree that reciting the Rule 431(b) principles together satisfies the requirements of the rule. See, *e.g.*, *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 62 (held trial court need not recite each principle separately); *People v. Choate*, 2018 IL App (5th) 150087, ¶ 44 (combining principles is not a *per se* violation of Rule 431(b)); *People v. Smith*, 2012 IL App (1st) 102354, ¶ 105 (Rule 431(b) does not mandate separate questioning for each principle); *People v. Davis*, 405 Ill. App. 3d 585, 590 (2010) (court is not required to separate the principles). We do note that some appellate court decisions have suggested that the better practice is to separate the principles and ask, after each principle is read one at a time, if the jurors understood and accepted each principle individually. See, *e.g.*, *People v. Perry*, 2011 IL App (1st) 081228, ¶ 74 (opining that the "better practice" would be for the court to ask the jurors if they "understand and accept each of the principles, after each principle is read"). But again, none of these decisions holds definitively that not separating the principles constitutes a violation of Rule 431(b).

¶ 36     Defendant cites several cases in an attempt to show a conflict among appellate court panels on how the four principles ought to be presented, but none of these cases supports his position. Rather than finding error in how the court presented the four principles, each of his cited cases found error because the trial court failed to ask if the prospective jurors understood and accepted all four principles or omitted a principle altogether. See, *e.g.*, *People v. Othman*, 2020 IL App (1st) 150823-B, ¶¶ 65-66 (court failed to ask if jurors understood one of the principles and failed to ask if they accepted another); *People v. Lampley*, 2011 IL App (1st) 090661-B, ¶ 35 (court failed to ask if jurors understood and accepted the principles and instead

asked if they had " 'any problems' " with the principles); *People v. McCovins*, 2011 IL App (1st) 081805-B, ¶ 36 (court provided prospective jurors with a broad statement of the law "interspersed with commentary on courtroom procedure and the trial schedule, and then concluded with a general question about the potential jurors' willingness to follow the law"); *Perry*, 2011 IL App (1st) 081228, ¶ 73 (asked general questions about jurors' willingness to follow the law but did not ask specifically whether they understood and accepted the principles); *People v. Hayes*, 409 Ill. App. 3d 612, 626-27 (2011) (finding error when the court combined the first three principles into one broad principle and failed to ask if prospective jurors "accepted" that principle); *People v. Johnson*, 408 Ill. App. 3d 157, 171 (2010) (court failed to ask if the prospective jurors understood and accepted any of the principles and omitted the fourth principle altogether). Unlike the trial courts in the above-noted appellate cases cited by defendant, the trial court in this case presented the Rule 431(b) principles to the venire members without eliminating any one of them, without interspersing the principles with other instructions, and without failing to ask whether the venire understood and accepted the principles.

¶ 37    Defendant reiterates the criticism expressed in the committee comments of our rule toward the past practice of trial judges making a broad statement of applicable law during *voir dire* followed by a general question about the potential juror's willingness to follow the law. Defendant intimates that the instant trial judge's verbatim recital of the Rule 431(b) criteria was akin to the broad statement and general question condemned by the committee comments.

¶ 38    But we find no merit to defendant's argument and find no such cause for concern under the circumstances of the present case. Here, the trial court did not provide a "broad statement of applicable law." Nor did it follow those four principles in the rule with "a general question concerning the juror's willingness to follow the law." Rather, the trial court carefully recited the four specific principles in the rule verbatim and then asked specific questions about whether the jurors accepted and understood those principles. Nor are there present any of the concerns involved in *Zehr* where the trial court in that case did not admonish about the four principles but instead asked a general question about whether the jurors would be willing to follow the law given to them. See *Zehr*, 103 Ill. 2d at 477.

¶ 39 Defendant also argues that the four principles in the rule involve "abstract and complicated concepts, which an ordinary layperson might struggle to take in." He maintains that grouping the principles together undermines the purpose of the rule, which is to exclude any juror "who is prejudiced against these bedrock principles."

¶ 40 We disagree that the purpose of the rule was undermined by reciting the principles together or that there was any danger of confusion by doing so. The "bedrock principles" defendant refers to are concepts that are familiar to the average layperson and relatively easy to understand. Jurors are often presented with far more numerous, and far more complicated, instructions at trial. Yet jurors are presumed to follow those instructions. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995).

¶ 41 In *Zehr*, and again in *Thompson*, this court stated that it is the prospective jurors' understanding and acceptance of the bedrock principles that is essential to ensuring that the jurors are fair and impartial. *Zehr*, 103 Ill. 2d at 477; *Thompson*, 238 Ill. 2d at 609. Here, the prospective jurors expressed their understanding and acceptance of the principles by a show of hands. Nothing in the record suggests that the jurors were confused by the court's presentation of the Rule 431(b) principles. And defense counsel asked follow-up questions about the presumption of innocence and the burden of proof to ensure to his satisfaction that the prospective jurors understood those principles. In sum, we find no merit to defendant's argument that the purpose of the rule is thwarted by reciting the four principles together.

¶ 42 Because we find that no error occurred with respect to this matter, we need not address defendant's argument on the remaining portion of the first prong of the plain-error analysis as to whether the evidence presented at his trial was closely balanced.

¶ 43 II. Restitution

¶ 44 Defendant next argues that the trial court erred in ordering him to pay $117,230 in restitution without any evidentiary support for awarding that amount. Once again, defendant recognizes that he did not properly preserve the claim but now argues that it is reviewable under the second prong of the plain-error doctrine. As noted above, under the second prong of the doctrine, we may consider a forfeited

claim when "a clear or obvious error occurred and that error is so serious it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Piatkowski*, 225 Ill. 2d at 565.

¶ 45     In response, the State concedes both that (1) the trial court erred in ordering defendant to pay the amount of restitution imposed without any evidentiary basis for it and (2) defendant was denied a fair sentencing hearing because of the error. Citing *People v. Lewis*, 234 Ill. 2d 32, 48-49 (2009), both defendant and the State urge that the proper remedy is for this court to remand the cause to the circuit court for a compliant hearing limited to the amount of restitution to be imposed.

¶ 46     We agree that a plain error occurred, affecting the integrity of the judicial process and the fairness of the proceeding; therefore, we find that the cause must be remanded for a new hearing on restitution.

¶ 47     As a component of the sentence, a trial court may order a defendant to pay restitution for an economic loss caused by his criminal conduct. 730 ILCS 5/5-5-6(a) (West 2014); see also *People v. Brooks*, 158 Ill. 2d 260, 265 (1994). Section 5-5-6(b) of the Unified Code of Corrections, however, provides in relevant part as follows:

> "In fixing the amount of restitution to be paid in cash, *** the court *shall assess the actual* out-of-pocket expenses, losses, damages, and injuries suffered by the victim named in the charge and any other victims who may also have suffered out-of-pocket expenses, losses, damages, and injuries proximately caused by the same criminal conduct of defendant ***." (Emphasis added.) 730 ILCS 5/5-5-6(b) (West 2014).

*C.f.* Black's Law Dictionary (11th ed. 2019) (defining "assess" as "[t]o calculate the amount *** of (a tax, fine, etc.)").

¶ 48     According to the statute's plain language, the trial court must evaluate the actual costs incurred by the victim and cannot rely on conjecture or speculation as to the amount to be awarded. See *People v. Dickey*, 2011 IL App (3d) 100397, ¶ 25. To satisfy the requirement, then, the trial court must receive sufficient information to evaluate the accuracy of the victim's restitution claim.

¶ 49 Here, there was no numerical evidence presented of the victim's losses. Roe did testify about the damages to his merchandise, the furniture, and his father's building. But his testimony merely described the general damage that occurred. It did not ultimately assist in calculating the cost of his *actual* losses. As the restitution amount awarded had no actual basis in the trial or sentencing evidence and was simply declared by the prosecutor and accepted by the sentencing court, we find that the restitution order requiring defendant to pay $117,230 was clear error.

¶ 50 We do note that there is a split of authority among appellate court panels over whether the lack of sufficient evidentiary support for a restitution order is an error so serious that it affects the fairness of the defendant's trial and challenges the integrity of the judicial process. Compare *People v. Jones*, 206 Ill. App. 3d 477, 482 (1990) (under the second prong of the plain-error doctrine, a forfeited claim that the restitution order lacked a sufficient evidentiary basis is reviewable), with *People v. Hanson*, 2014 IL App (4th) 130330, ¶¶ 36, 40 (declining to follow *Jones* and instead finding that the restitution claim was not reviewable as plain error because it was not sufficiently grave that it deprived the defendant of a fair trial). We find that *Jones* took the correct approach. Accordingly, we now overrule *Hanson*.

¶ 51 Our conclusion is supported by an analogous decision of this court in *Lewis*, 234 Ill. 2d at 47-49, which held that an unpreserved challenge to the assessment of a street-value fine was a plain error that affected the integrity of the judicial process and the fairness of the proceeding. In resolving the claim, this court noted that the relevant statute provided that the street-value fine " 'shall be determined by the court on the basis of testimony of law enforcement personnel and the defendant as to the amount seized and such testimony as may be required by the court as to the current street value of the *** controlled substance seized." *Id.* at 44 (quoting 730 ILCS 5/5-9-1.1(a) (West 2004)). This court then found that the clear statutory language required some evidentiary basis for the circuit court to determine the current street value of the contraband and, as there was no such evidence before it, the circuit court clearly erred in ordering the street-value fine. *Id.* at 46-47.

¶ 52 *Lewis* then held as follows:

"The error here is more than a simple mistake in setting the fine. Rather, it is a failure to provide a fair process for determining the fine based on the current

street value of the controlled substance. Plain-error review is appropriate because imposing the fine without any evidentiary support in contravention of the statute implicates the right to a fair sentencing hearing. [Citation.] The integrity of the judicial process is also affected when a decision is not based on applicable standards and evidence, but appears to be arbitrary." *Id.* at 48.

In concluding that plain-error review was appropriate, *Lewis* further determined that "[a]n error may involve a relatively small amount of money or unimportant matter, but still affect the integrity of the judicial process and the fairness of the proceeding if the controversy is determined in an arbitrary or unreasoned manner." *Id.* Finally, *Lewis* determined that the appropriate remedy was to vacate the street-value fine and to remand the cause for imposition of a new fine based on evidence of the street value of the drugs seized. *Id.* at 49.

¶ 53    Similar to the street-value statute at issue in *Lewis*, the restitution statute in the instant case requires the trial court to determine the amount of restitution based on such factors as "actual out-of-pocket expenses, losses, [and] damages." 730 ILCS 5/5-5-6(b) (West 2014). In light of our holding in *Lewis*, we vacate the restitution order in the present case and remand to the circuit court for a new hearing and a determination as to the appropriate amount of restitution owed.

¶ 54    Our resolution of this issue makes it unnecessary to address defendant's remaining claim that his trial counsel rendered ineffective assistance in failing to object to the restitution order.

¶ 55                                    CONCLUSION

¶ 56    For the foregoing reasons, we hold that the appellate court correctly found that no error occurred in the admonishments given to the prospective jurors pursuant to Rule 431(b). However, the restitution order requiring defendant to pay $117,230 was entered erroneously without sufficient evidentiary support and constituted plain error. The appellate court consequently erred in affirming that restitution order. The restitution order must therefore be vacated and the cause remanded for a new hearing on restitution.

¶ 57        Accordingly, we affirm the judgment of the appellate court in part and reverse in part and remand the cause to the circuit court for a new hearing on the amount of restitution to be imposed.

¶ 58        Appellate court judgment affirmed in part and reversed in part.

¶ 59        Circuit court judgment affirmed in part and vacated in part.

¶ 60        Cause remanded with directions.

¶ 61        JUSTICE NEVILLE, dissenting:

¶ 62        The majority holds that the trial court did not err during *voir dire* because the *voir dire* procedure employed by the trial court was all that is required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and the jurors were properly admonished by the trial court. I disagree with the majority's holding.

¶ 63        First, I believe the trial court erred when it (1) conducted group rather than individual questioning of each of the 32 prospective jurors; (2) asked two sets of 16 prospective jurors two compound questions about each of the four principles in Rule 431(b) and elicited no information about the jurors' beliefs and opinions because it accepted silent, nonverbal, show-of-hands group answers from the 32 jurors to the two compound questions; (3) inferred from the prospective jurors' silent, nonverbal, show-of-hands group answers that the prospective jurors understood the four legal principles; (4) used silent, nonverbal, show-of-hands group answers, which precluded a record about each juror's biases and prejudices and left the trial court and this court with no information to evaluate each juror's qualifications to serve impartially on a jury; (5) failed to read the four principles verbatim when it read the four principles and omitted the numbers separating the principles; (6) omitted the numbers separating the four principles and by doing so collapsed the four Rule 431(b) principles into one broad statement; (7) failed to read the four principles verbatim when it added words to the four legal principles; (8) abdicated its duty to determine the 32 jurors' knowledge of the four principles and their biases and prejudices by permitting the 32 jurors to provide silent, nonverbal, show-of-hands group answers to two compound questions, which did

- 17 -

not provide information for the court to assess credibility, and therefore, the jurors' silent, nonverbal, group, show-of-hands answers did not provide the trial court with information to make a judicial decision about the 32 jurors' impartiality. I believe that the aforementioned errors individually constitute clear and obvious errors and, collectively, they rise to the level of second prong plain error, or structural error, because they denied defendant his right to a fair trial. *People v. Thompson*, 238 Ill. 2d 598, 614, (2010) ("A finding that defendant was tried by a biased jury would certainly satisfy the second prong of plain-error review because it would affect his right to a fair trial and challenge the integrity of the judicial process.").

¶ 64    Second, because the evidence in this case is circumstantial and because there is no eyewitness testimony or forensic or video evidence that establishes defendant committed the burglary and arson, the evidence in this case can only be considered closely balanced. Because I find error under both the first and second prong of the plain-error doctrine, I would reverse defendant's conviction and remand for a new trial.

¶ 65    Finally, I believe that Rule 431(b) is unconstitutional on its face because the rule permits group questioning of jurors and silent, nonverbal, show-of-hands answers and because that procedure prevents the trial court from obtaining information about each prospective juror's biases and opinions. I believe that Rule 431(b) must be amended to codify a *voir dire* procedure that protects a defendant's right to a fair trial by an impartial jury. Therefore, I respectfully dissent.

¶ 66                                    I. BACKGROUND

¶ 67    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) requires the trial court to "conduct *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate, touching upon their qualifications to serve as jurors in the case at trial." The court must allow the parties to examine the prospective jurors for a reasonable period of time. *Id.* But the court must specifically ask "each potential juror, individually or in a group, whether that juror understands and accepts" four legal principles. *Id.* The text of the rule then *enumerates* each of those principles:

"(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant

- 18 -

guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." *Id.*

¶ 68 Additionally, Rule 431(b) explains *how* the trial court should elicit information from prospective jurors: "The court's method of inquiry shall provide *each* juror an opportunity to respond to *specific questions* concerning the principles set out in this section." (Emphases added.) *Id.*

¶ 69 A. The Trial Court's Application of Rule 431(b)

¶ 70 In this case, the trial court conducted *voir dire* by questioning 32 prospective jurors in two panels consisting of 16 jurors each. The record reveals the trial court admonished the first panel of 16 prospective jurors as follows:

"THE COURT: This is a criminal case as I mentioned. The Defendant is presumed innocent. There are a number of propositions of law that you must be willing to follow if you are going to serve as a juror in this case. So I am going to recite those for you now. Please listen carefully as I will be asking if you understand these principles of law and if you accept these principles of law.

A person accused of a crime is presumed to be innocent of the charge against him. The fact that a charge has been made is not to be considered as any evidence or presumption of guilt against the defendant.

The presumption of innocence stays with the defendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved the defendant's guilt beyond a reasonable doubt.

The State has the burden of proving the defendant's guilt beyond a reasonable doubt. The defendant does not have to prove his innocence. The defendant does not have to present any evidence on his own behalf and does not have to testify if he does not wish to. If the defendant does not testify, that fact must not be considered by you in arriving at your verdict.

So by a show of hands, do each of you understand these principles of law?

PROSPECTIVE JURORS: (All hands raised).

THE COURT: Okay. And do each of you accept these principles of law?

PROSPECTIVE JURORS: (All hands raised).

THE COURT: All right. Thank you."

Next, the trial court instructed the second panel of 16 jurors as follows:

"THE COURT: All right. Again, I have to recite the propositions of law with you because, well, because I am required to, but also because it's very important. So please listen carefully.

A person accused of a crime is presumed to be innocent of the charge against them. The fact that a charge has been made is not to be considered as any evidence or presumption of guilt against the defendant.

The presumption of innocence stays with the defendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved the defendant's guilt beyond a reasonable doubt.

The State has the burden of proving the defendant's guilt beyond a reasonable doubt. The defendant does not have to prove his innocence. The defendant does not have to present any evidence on his own behalf and does not have to testify if he does not wish to. If the defendant does not wish to testify, that fact must not be considered by you in any way in arriving at a verdict.

So by a show of hands, do each of you understand these principles of law?

PROSPECTIVE JURORS: (All hands raised).

THE COURT: And do each of you accept these principles of law?

PROSPECTIVE JURORS: (All hands raised).

THE COURT: All hands have gone up. Thank you."

¶ 71    The trial judge's admonishments make it clear that the trial judge read the four principles but omitted the numbers that separate the principles. Compare Ill. S. Ct. R. 431(b) (eff. July 1, 2012), with *supra* ¶¶ 69-70. The trial judge not only omitted the numbers that separated the four principles but included her own thoughts about the rules, and the judge's comments are not included in the rule. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Finally, the trial court's admonishments are not a verbatim reading; by omitting the numbers from the four principles, the trial judge's admonishment became one long statement of the principles that is not separated by numbers and was interspersed with the judge's personal comments. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 72    After the trial court's *voir dire*, the court permitted defense counsel to question the prospective jurors regarding the principles. Defense counsel only asked the following group questions:

> "MR. BERTRAM [(DEFENDANT'S ATTORNEY)]: First of all, and if you agree, please raise your hand like you've done before here. Do all of you understand as my client sits here beside me that he is presumed innocent and it's the State's job, it's the State's burden to prove him guilty beyond a reasonable doubt? Does everybody understand that? Would you please raise your hand?
>
> PROSPECTIVE JURORS: (All hands raised.)
>
> MR. BERTRAM: All hand raised. Okay. And do you also understand that it is not, my client does not have to present any evidence? He does not have to stand up and testify. That is, again it's the burden of the State to bring enough evidence here to prove him guilty; and if they do not do so, then, well, I won't to get that until the end."

Defendant's attorney also asked the jurors generally about their ability to focus on the trial and to be fair to defendant. Defense counsel ended his *voir dire* this way:

> "MR. BERTRAM: Ladies and gentlemen, one final question; and this is for all of you and please raise your hands. If the State is unable to prove my client guilty beyond a reasonable doubt after you've heard all the evidence in this case—well, you know what? I'm sorry. I'm going to ask one question first. Can

you all wait and hear all of the evidence and go back when you deliberate to deliberate [*sic*]this to decide whether the State's proved my client guilty beyond a reasonable doubt? Can you all do that? If we can, please raise your hand.

PROSPECTIVE JURORS: (All raise hands.)

MR. BERTRAM: And now my final question. If the State was unable to prove my client guilty beyond a reasonable doubt, can you all return a verdict of not guilty? If you can, please raise your hand.

PROSPECTIVE JURORS: (All hands raised.)"

¶ 73 Defendant's attorney questioned the second panel of the prospective jurors about the principles by asking only the following:

"MR. BERTRAM: And as you all stand there, and again raise your hand if you agree with this, do you understand that as my client sits here that he is presumed innocent and it's the job of the State to prove him guilty beyond a reasonable doubt? Does everybody understand that? If so, please raise your hand.

PROSPECTIVE JURORS: (All hands raised.)

MR. BERTRAM: All hands raised. Does everybody agree with that? Sorry. Jumped the gun. Does anybody not agree with that, think we should do it another way? If so, raise your hand. ***

PROSPECTIVE JURORS: (No response.)

MR. BERTRAM: Okay. No hands raised. Good."

¶ 74 Twelve of the thirty-two prospective jurors were selected, and the case proceeded to trial. The jury convicted defendant of burglary and arson and the trial court sentenced him to 24 years and 6 months' imprisonment on each count to be served concurrently. Defendant filed an appeal.

¶ 75                         B. The Appellate Court's Holding

¶ 76    In the appellate court, defendant argued the trial court failed to properly admonish the prospective jurors pursuant to Rule 431(b) because the trial court conflated all four principles and asked whether the prospective jurors understood and accepted this one broad proposition, rather than asking whether the prospective jurors understood and accepted each individual principle. 2019 IL App (4th) 170341-U, ¶ 28. Defendant admitted he forfeited that argument but asked the appellate court to review it under the plain-error rule. The appellate court conducted the first step in the plain-error analysis and held that "no error occurred with the Rule 431(b) admonishments in this case." *Id.* ¶ 32.

¶ 77                              C. This Court's Holdings

¶ 78    The majority affirms the appellate court. The majority concludes the trial court committed no errors during *voir dire* based on the following holdings:

       First, the majority holds the trial court did not err when it admonished the 32 prospective jurors in two groups consisting of 16 prospective jurors each. *Supra* ¶ 27.

       Second, the majority holds the rule plainly states that the trial court can ask the questions to prospective jurors as a group. *Supra* ¶ 27.

       Third, the majority holds that the rule does not require that jurors' responses be oral rather than by a show of hands. *Supra* ¶ 27.

       Fourth, the majority holds the procedure followed by the trial court was all that was required by the plain language of the rule. *Supra* ¶ 27.

       Fifth, the majority also holds that the procedure followed by the trial court was consistent with the committee comments to the rule, which state the rule seeks to end the practice where courts make a broad statement of the law. *Supra* ¶ 28; see Ill. S. Ct. R. 431(b), Committee Comments.

       Sixth, the majority holds the trial court did not err by admonishing the prospective jurors about the principles in a group because it "asked specific questions about whether the jurors accepted and understood those principles." *Supra* ¶ 38.

Seventh, the majority also holds that the trial court did not err because it did not provide a " 'broad statement of applicable law.' " *Supra* ¶ 38.

Eighth, the majority holds that the trial court did not err when it "carefully recited the four specific principles in the rule verbatim." *Supra* ¶ 38.

Ninth, the majority holds the trial court did not ask " 'a general question concerning the juror's willingness to follow the law.' " *Supra* ¶ 38.

Tenth, the majority holds the four Rule 431(b) principles do not involve " 'abstract and complicated concepts, which an ordinary layperson might struggle to take in.' " *Supra* ¶ 39.

Eleventh, the majority holds that the " 'bedrock principles' " defendant refers to "are concepts that are familiar to the average layperson and relatively easy to understand." *Supra* ¶ 40.

Twelfth, the majority holds that the prospective jurors expressed their understanding and acceptance of the principles by a show of hands and that there is nothing in the record to suggest that the jurors were confused by the trial court's presentation of the Rule 431(b) principles. *Supra* ¶ 41.

¶ 79    I disagree with all of the majority's holdings.

¶ 80                                    II. ANALYSIS

¶ 81                              A. Standard of Review

¶ 82    When reviewing the plain language of Rule 431(b), and the case law interpreting the rule, our review is *de novo*. *People v. Abdullah*, 2019 IL 123492, ¶ 18 ("interpretation of a supreme court rule [is] *** subject to *de novo* review"); *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 429 (2009) (where judgment is "based upon *** interpretation of existing case law" the "review is *de novo*"). However, in reviewing the trial court's implementation and execution of the *voir dire* admonishments in Rule 431(b), we review the trial court's manner and scope of *voir dire* for an abuse of discretion. See *People v. Rinehart*, 2012 IL 111719, ¶ 16 ("the manner and scope of the examination rests within the discretion of the trial court, and we review such decisions for an abuse of discretion").

¶ 83     Reviewing the manner and scope of the trial court's examination means that we examine the trial court's *voir dire* questions to determine whether the trial court elicited information from prospective jurors to learn of each prospective juror's beliefs and opinions, biases, and prejudices, so defendant is assured a fair and impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992); *Wainwright v. Witt*, 469 U.S. 412, 424 n.6 (1985). I believe the manner and scope of the trial court's implementation and execution of the procedure prescribed in the plain language of Rule 431—group questions and silent, show-of-hands answers by jurors—provided no information and denied defendant his constitutional right to a fair trial. Accordingly, the trial court erred and abused its discretion when it conducted *voir dire* in this case.

¶ 84                                    B. Plain-Error Review

¶ 85     On appeal to this court, defendant acknowledges he did not preserve his Rule 431(b) claim before the trial court and, as a result, he has forfeited the argument. Accordingly, defendant seeks plain-error review of the issue in this case.

¶ 86     "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). "The plain error doctrine is a narrow and limited exception to the general rule of procedural default. [Citation.]" *People v. Downs*, 2015 IL 117934, ¶ 15. As this court has explained,

> "the plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 87     " 'Clear' or 'obvious' in the context of the plain-error doctrine means that the law is well settled at the time of trial; if the law was unclear at the time of the trial, but becomes clear (*i.e.*, settled) during the appeal, then the error is not 'plain' for

purposes of the plain-error doctrine. [Citations.]" *People v. Downs*, 2014 IL App (2d) 121156, ¶ 20 (citing *In re M.W.*, 232 Ill. 2d 408, 431 (2009), citing *Piatkowski*, 225 Ill. 2d at 565 n.2, citing *United States v. Olano*, 507 U.S. 725, 734 (1993)), *rev'd on other grounds*, 2015 IL 117934, ¶ 20; see also *United States v. Sumner*, 265 F.3d 532, 539 (7th Cir. 2001) (" 'Plain' in this context is synonymous with clear or obvious. At a minimum, this means the error must be clear under current law." (citing *Olano*, 507 U.S. at 734)).

¶ 88                    C. The United States Supreme Court Has Settled *Voir Dire* Law

¶ 89        The law is settled on how the trial court should conduct *voir dire*. A criminal defendant's right to trial by a fair and impartial jury is guaranteed by both the United States and Illinois Constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process."). The constitutional guarantee of a fair and impartial jury includes the right to an adequate *voir dire* to identify and "remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence." (Internal quotation marks omitted.) *Morgan*, 504 U.S. at 729-30. "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993) (citing *Wainwright*, 469 U.S. at 424); see also *Irvin*, 366 U.S. at 723.

¶ 90        *Voir dire* errors occurred in this case when no information was elicited from prospective jurors during group questioning with silent, nonverbal, show-of-hands group answers about each prospective juror's beliefs and opinions, so that the trial court could determine each potential juror's qualifications to sit as an impartial juror. Accordingly, because no information was elicited from prospective jurors by the trial court, no *voir dire* took place in this case.

¶ 91                    D. *Voir Dire* Questions to Be Answered by This Court

¶ 92        In this case we must determine whether the trial judge's admonishments and questioning of two panels of 16 prospective jurors complied with the constitution's *voir dire* requirements, which mandate that the trial judge's admonishments and questioning permit him or her to elicit information from each prospective juror about their beliefs and opinions so the trial judge can make a decision about the prospective jurors' impartiality. See *Skilling v. United States*, 561 U.S. 358, 394-95 (2010). In *Skilling*, the jurors affirmed on their pretrial questionnaires that they would have no trouble basing a verdict only on the evidence at trial. See *id.* at 388 (pretrial questionnaire "helped to identify prospective jurors excusable for cause"). Nevertheless, the trial court followed up by questioning each prospective juror individually to uncover concealed biases and prejudices. *Id.* at 373-74, 388. The *Skilling* Court pointed out that the federal district court's "face-to-face opportunity to gauge demeanor and credibility, coupled with information from the questionnaires regarding jurors' backgrounds [and] opinions *** gave the court a sturdy foundation to assess fitness for jury service." *Id.* at 395. We must determine whether the *voir dire* procedure in this case permitted the trial court to determine the 32 prospective jurors' fitness for jury service.

¶ 93        E. Group *Voir Dire* Procedures Denied Defendant His Right to a Fair Trial

¶ 94        In this case, we must determine whether the group admonishments and questioning of prospective jurors and the silent, nonverbal, show-of-hands group answers by prospective jurors elicited any information about the prospective jurors' beliefs, opinions, biases, or prejudices so that the trial court could make a decision about each juror's impartiality. We must also determine whether the trial court's questions—(1) "do you understand these principles of law" and (2) "do you accept these principles of law"—produced a record that permitted the trial court to ascertain information about each prospective juror's beliefs and opinions in order to allow removal of any of the 32 members with a bias or prejudice against defendant. I submit that the trial court's group questioning and silent, show-of-hands answers allowed the jurors' possible prejudices to go undiscovered, thus thwarting the very purpose of *voir dire*. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994) ("If conducted properly, *voir dire* can inform litigants about potential jurors ***. *Voir dire* provides a means of discovering actual or implied bias ***."). Accordingly, I maintain the trial court committed multiple errors and

abused its discretion when it exercised its discretion and selected group instead of individual questioning of the 32 jurors. See *id.*

¶ 95                            F. The Trial Court's Plain Errors

¶ 96                        *1. The Trial Court Erred When It Conducted*
                       *Group Rather Than Individual Questioning*
                          *of Each of the 32 Prospective Jurors*

¶ 97       The majority holds the trial court did not err when the trial court questioned the prospective jurors in two groups of 16. Rule 431(b) provides that the trial court may ask questions of "each potential juror, individually or in a group." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Thus, the rule gives the trial court discretion to determine whether it will use individual or group questioning. In this case, the trial court exercised its discretion and elected to conduct *voir dire* of the 32 jurors with group questioning. By doing so, the trial court violated defendant's right to a fair trial because group questioning did not permit the trial court to elicit information from each of the 32 jurors so the court could identify impartial jurors.

¶ 98       While Rule 431(b) does permit group questioning, defendant's right to a fair trial was violated because group questioning of individual jurors does not permit a trial court to elicit information about each prospective juror's beliefs and opinions so that the trial court can determine each prospective juror's impartiality. *Morgan*, 504 U.S. at 729-30; *Wainwright*, 469 U.S. at 424; *Irvin*, 366 U.S. at 723. The plain language of Rule 431(b) prescribes how the trial court should elicit information from each prospective juror: "The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). Here, the trial court's group method of inquiry did not provide each prospective juror with an opportunity to respond to specific questions concerning the juror's beliefs, opinions, biases, or prejudices.

¶ 99       I think the trial court abused its discretion when it elected to question the 32 jurors in a group, instead of individually. See *id.* In order to avoid violating the defendant's constitutional rights, each prospective juror must be questioned individually in order to comply with the constitution's command to ascertain

information about each prospective juror's beliefs and opinions to determine the prospective jurors' impartiality. See *Morgan*, 504 U.S. at 729-30 ("part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors. *** 'Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions *** cannot be fulfilled.' " (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion))); *Wainwright*, 469 U.S. at 424 ("determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism"); *Irvin*, 366 U.S. at 723 (the duty to adjudicate the question of impartiality lies with the judge); see also *Skilling*, 561 U.S. at 394 (holding the district court's *voir dire* did not fall short of constitutional requirements where district court questioned potential jurors independently and did not "simply take venire members who proclaimed their impartiality at their word"). Therefore, the trial court erred and abused its discretion when it conducted group rather than individual questioning of each of the 32 prospective jurors.

¶ 100
*2. The Trial Court Erred When It Asked Potential*
*Jurors Two Compound Questions About the*
*Four Principles in Rule 431(B) and Received*
*No Information About the Juror's Beliefs and Opinions*
*Because It Accepted Silent, Nonverbal,*
*Show-of-Hands Group Answers From*
*the 32 Jurors to the Two Compound Questions*

¶ 101      In this case the trial judge omitted the four numbers separating the principles, recited all four principles in a broad statement, and then asked the prospective jurors if they understood the principles. When the court asked two questions about the unnumbered principles, (1) do you understand the principles and (2) do you accept the principles, the court was asking the 32 prospective jurors whether they (1) understood each of the four principles and (2) whether they accepted each of the four principles. By asking the 32 prospective jurors if they understood the four principles incorporated in the court's broad statement, the trial court was asking a compound question: whether the jurors understood each of the four principles in the court's broad statement. The court's compound question asked about the four

- 29 -

principles but permitted prospective jurors to give only one answer about the four principles collectively. If prospective jurors give one answer to a question concerning four principles, the answer will be unclear. Craig Lee Montz, *Trial Objections From Beginning to End: The Handbook for Civil and Criminal Trials*, 29 Pepp. L. Rev. 243, 289 (2002).

¶ 102    Compound questions cause confusion and are objectionable because when a witness or juror answers a question consisting of two or more questions, it is hard to determine which question is being answered. See E. Cleary & M. Graham, Handbook of Illinois Evidence § 611.20, at 550 (7th ed. 1999). Here, asking the group of 32 jurors two compound questions involving four principles prevented the trial court from determining whether each prospective juror both understood and accepted each of the four legal principles. By not asking about the four principles in separate questions, it cannot be determined from the record which of the four principles, if any, the prospective jurors understood and accepted.

¶ 103    The 32 prospective jurors' silent, group answers to the two compound questions elicited no information for the trial court to assess the prospective jurors' beliefs and opinions. Therefore, because the trial court had no information about these jurors' biases and prejudices, the trial court had no information about the prospective jurors' impartiality, and the trial court's lack of information denied defendant a fair trial. Accordingly, the trial court erred and abused its discretion when it asked two sets of 16 prospective jurors a compound question about each of the four principles in Rule 431(b) and accepted silent, nonverbal, show-of-hands group answers from 32 jurors to the two compound questions.

¶ 104                    *3. The Trial Court Erred When It Inferred*
*From the Potential Jurors' Nonverbal, Show-of-Hands*
*Group Answers That the Potential Jurors*
*Understood the Four Legal Principles*

¶ 105    The majority concludes, without citation of any authority, that the " 'bedrock principles' *** are concepts that are familiar to the average layperson and relatively easy to understand." *Supra* ¶ 40. I disagree because commentators point out that legal principles are not only difficult for lay jurors to understand and apply but are also difficult for law students to understand and apply. Christopher N. May, *"What*

*Do We Do Now?": Helping Juries Apply the Instructions*, 28 Loy. L.A. L. Rev. 869, 870 (1995) ("[T]he problem that these juries face[ ] is identical to that which confounds most law students—sometimes well into the second year. Lay jurors, who have received no more than an hour or two of legal instruction, cannot be expected to perform better than those who have studied diligently for months.").

¶ 106     The majority also finds that "[j]urors are often presented with far more numerous, and far more complicated, instructions at trial." *Supra* ¶ 40. Jurors are certainly presented with "far more numerous, and far more complicated, instructions at trial." But what the majority fails to note is that the pretrial instructions in this case are different from posttrial instructions, which are presented to the jury in writing, for their use during deliberations, where they can study, discuss, and agree on their meaning. See, *e.g.*, *People v. Williams*, 2013 IL App (4th) 110936, ¶ 22 (" 'The purpose of [a jury] instruction is to guide the jury in its deliberations and to help it reach a proper verdict through the application of legal principles as applied to the evidence and the law.' [Citation.]"). Here, the pretrial instructions about the four legal principles were communicated to the 32 prospective jurors without a written copy being given to the jurors, without an opportunity for them to read the four principles, and without an opportunity for them to discuss the four principles with other jurors. The trial court's presentation of the four principles was complicated by the fact that the 32 prospective jurors were asked a compound question: one question—do you understand—and that one question asked about four different principles.

¶ 107                          a. Presumption of Innocence

¶ 108     I maintain that even the use of the phrase "presumption of innocence," without more, can confuse jurors. Other courts have noted that "[i]t is not unusual for a juror to be confused or uncertain about the presumption of innocence because it is a difficult legal concept." *People v. Young*, 16 P.3d 821, 825 (Colo. 2001) (*en banc*). Scholars have studied laypersons' ability to understand legal principles and found that even second-year law students struggle with understanding jury instructions. May, *supra*, at 870. "Studies literally abound demonstrating the extent to which jurors misapprehend the relevant law. The problem is especially severe when the law is set forth in pattern instructions that—because they are designed without the

facts of any particular case in mind—tend to be abstract, general, and technical." *Id.* at 872. Rule 431(b) only says "the defendant is presumed innocent of the charge(s) against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). I believe the 32 prospective jurors' silent, show-of-hands group answer to the trial court's compound question, which includes the jurors' understanding of the presumption of innocence, did not provide enough information for the trial court to make a judicial determination about whether each prospective juror both understood and accepted that principle.

¶ 109                     b. Proof Beyond a Reasonable Doubt

¶ 110     In addition, commentators point out that jurors can experience difficulty applying jury instructions to the facts of a given case. May, *supra*, at 870 ("We must try to recapture our innocence if we are to make the jury's task a meaningful one."); see also Lawrence T. White & Michael D. Cicchini, *Is Reasonable Doubt Self-Defining*?, 64 Vill. L. Rev. 1, 8 (2019) (reviewing studies and concluding that jurors struggle with the concept of beyond a reasonable doubt); Firoz Dattu, *Illustrated Jury Instructions: A Proposal*, 22 Law & Psychol. Rev. 67, 100 (1998) (noting that "[s]ome legal concepts are inherently difficult to explain" to jurors). Empirical studies have shown that, without instruction, "jurors may underestimate the quantum of evidence needed for a criminal conviction." Timothy P. O'Neill, *Instructing Illinois Juries on the Definition of "Reasonable Doubt": The Need for Reform*, 27 Loy. U. Chi. L.J. 921, 924 (1996). Commentators have found that "instructions should carefully define reasonable doubt for jurors." White, *supra*, at 2.

¶ 111     Studies have also shown that jurors' comprehension of instructions in any form "varies among jurors, partly in relation to their educational level," and more "telling are studies showing that jurors frequently cannot answer simple true-false questions concerning statements of law taken from instructions they were given in court. Their understanding is often little better than that of persons who never heard the instructions at all." May, *supra*, at 879-80.

¶ 112     I think the majority's assumption that the prospective jurors understood the four principles without evidence in the record (the 32 prospective jurors answered with a show of hands) denied defendant a fair trial before an impartial jury. "[T]he most

pressing constitutional issue in this case is whether the jury eventually selected was able to lay aside any preconceived notions and enter the jury box impartial." Sophia R. Friedman, *Sixth Amendment—The Right to an Impartial Jury: How Extensive Must Voir Dire Questioning Be?*, 82 J. Crim. L. & Criminology 920, 937 (1992). The trial court's recital of the four principles to a diverse group of prospective jurors, without probing whether each prospective juror understood the four principles, is an abuse of the court's discretion.

¶ 113        Clearly questioning prospective jurors individually will require additional time, which I also note could be mitigated with the use of an appropriate prescreening questionnaire. See State v. Chauvin, No. 27-CR-20-12646 (Dist. Ct. Hennepin County, Minn.), Special Juror Questionnaire, https://www.mncourts.gov/mncourts gov/media/High-Profile-Cases/27-CR-20-12646/JurorQuestionnaire12222020.pdf (Dec. 22, 2020) [https://perma.cc/F5TW-39ML] (juror questionnaire for trial of four police officers in the death of George Floyd). Taking additional time to ensure that a criminal defendant facing a deprivation of liberty is judged by an impartial jury is a small price to pay.

> "[I]t would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute." (Internal quotation marks omitted.) *Mu'Min v. Virginia*, 500 U.S. 415, 446 (1991) (Marshall, J., dissenting, joined by Blackmun and Stevens, JJ.) (quoting *Aldridge v. United States*, 283 U.S. 308, 315 (1931)).

The trial court erred and abused its discretion when it inferred from the prospective jurors' silent, nonverbal, show-of-hands group answers that the prospective jurors understood the four legal principles.

¶ 114                    *4. The Trial Court Erred When It Used Silent, Nonverbal,*
                    *Show-of-Hands Group Answers, Which Precluded a Record*
                       *About Each Juror's Biases and Prejudices and*
                    *Left the Trial Court and This Court With No Information*
                       *to Evaluate Each Juror's Qualifications to Serve*
                               *Impartially on a Jury*

¶ 115    The trial court asked prospective jurors to indicate their response to a compound question—one question: do you understand, which inquired about the four legal principles—by a show of hands. The show-of-hands, group answer by the 32 prospective jurors was a silent, nonverbal answer. A silent, nonverbal answer leaves no record concerning the individual prospective juror's beliefs and opinions. Without a record for the court to evaluate the prospective juror's beliefs and opinions, there is no way for the trial court or this court to assess juror impartiality. This trial court violated defendant's right to a fair trial by not eliciting information from each prospective juror to determine their impartiality. Therefore, the trial court abused its discretion by permitting the prospective jurors to provide silent, nonverbal answers to the court's questions.

¶ 116    Commentators have also stated, "It is arguably impossible for a trial judge to assess demeanor when there is no demeanor to assess, only silence." Friedman, *supra*, at 940. In *Mu'Min*, 500 U.S. at 419-20, the trial court asked potential jurors, in a group, whether outside information they may have learned about the case would affect their impartiality. One potential juror responded affirmatively, but the remaining potential jurors simply remained silent. *Id.* at 420. The process in this case of having prospective jurors raise their hands if *they* believe *they* understand and accept the four legal principles is directly analogous to the silent response to group questioning in *Mu'Min*. See *id.* at 452 (Kennedy, J., dissenting) ("I fail to see how the trial court could evaluate the credibility of the individuals seated on this jury. The questions were asked of groups, and individual jurors attested to their own impartiality by saying nothing."). In neither case was the trial court provided with any information about individual jurors' biases or prejudices, nor with their actual understanding of the principles and ability to apply them to the case.

¶ 117    "[T]he trial court [has] no effective opportunity to assess the demeanor of each prospective juror in disclaiming bias" by simply having prospective jurors raise their hands along with everyone else. (Internal quotation marks omitted.) See *id.* at 451 (quoting *Mu'Min v. Commonwealth*, 389 S.E.2d 886, 901 (Va. 1990) (Whiting, J., dissenting, joined by Stephenson and Hassell, JJ.)). The raising of a hand is lacking in "tone of voice *** [which may] suggest[ ] [bias] to the trial judge." See *id.* at 433 (O'Connor, J., concurring); see also *Patton v. Yount*, 467 U.S. 1025, 1038 n.14 (1984) ("Demeanor plays a fundamental role not only in determining juror credibility, but also in simply understanding what a potential juror is saying. Any

complicated *voir dire* calls upon lay persons to think and express themselves in unfamiliar terms, as a reading of any transcript of such a proceeding will reveal. Demeanor, inflection, the flow of the questions and answers can make confused and conflicting utterances comprehensible."). The trial court erred and abused its discretion when it used silent, nonverbal, show-of-hands group answers, which did not create a record about each juror's biases and prejudices, and therefore there is no basis for the trial court or this court to evaluate each prospective juror's qualifications to serve as an impartial juror.

¶ 118                    *5. The Trial Court Erred When It Failed to Read the*
                          *Four Principles Verbatim When It Read the*
                          *Four Principles and Omitted the Numbers*
                          *Separating the Principles*

¶ 119     The majority holds the trial court did not err because "the circuit court read the specific principles set forth in the rule *verbatim* to the prospective jurors." (Emphasis added.) *Supra* ¶ 27. A review of Rule 431(b) will reveal that the majority has misstated the facts. The trial court did not read Rule 431(b) verbatim. Compare Ill. S. Ct. R. 431(b) (eff. July 1, 2012), with *supra* ¶¶ 69-70. Therefore, by failing to read Rule 431(b) to the prospective jurors as written, the trial court abused its discretion.

¶ 120     Rule 431(b) numbers each principle. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012). By doing so, Rule 431(b) demonstrates that each principle constitutes a distinct legal concept that should be recited separately by the trial court and answered separately by each prospective juror. A review of the trial transcript reveals the trial court omitted the numbers when it read the Rule 431(b) principles. See *id.* When the trial court failed to read the numbers "(1)," "(2)," etc., it failed to separate the principles into four distinct legal concepts. By failing to number the principles into separate, distinct legal concepts, the trial court made it difficult for the jurors to distinguish between the four principles and for the trial court to gauge each juror's understanding and acceptance of each of the four principles. The trial court's unnumbered admonishments thwarted the purpose of *voir dire* by engendering juror confusion as to the meaning of the four principles. Accordingly, the trial court erred and abused its discretion when it failed to read the Rule 431(b) principles

- 35 -

verbatim, because it read the four principles but omitted the numbers separating the principles.

¶ 121
*6. The Trial Court Erred When It Omitted the*
*Numbers Separating the Four Principles and*
*by Doing So Collapsed the Four Rule 431(B)*
*Principles Into One Broad Statement*

¶ 122    In this case, the record reveals the trial court read the Rule 431(b) principles without the numbers when it admonished the 32 prospective jurors. By omitting the numbers separating the Rule 431(b) principles, the principles were collapsed into a broad statement. See *supra* ¶¶ 69-70 (The Trial Court's Application of Rule 431(b)). Supreme court case law holds that the trial court must refrain from making a broad statement about the applicable law embodied in the four legal principles enumerated in the rule. See *People v. Hunter*, 2013 IL 114100, ¶ 17; *Thompson*, 238 Ill. 2d at 607; *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332-33 (2002). The committee comments to Rule 431 also state that the rule "seeks to end the practice where the judge makes a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law." Ill. S. Ct. R. 431, Committee Comments. Here, the trial court violated supreme court case law and the committee comments and abused its discretion, when it omitted the numbers separating the four principles and by doing so collapsed the four Rule 431(b) principles into one broad statement.

¶ 123
*7. The Trial Court Erred When It Failed to*
*Read the Four Principles Verbatim When*
*It Added Words to the Legal Principles*

¶ 124    Additionally, instead of reading the principles "verbatim," a review of the trial transcript reveals the trial court added words that are not included in the principles. See *supra* ¶¶ 69-70. For example, the trial court stated, "there are a number of propositions of law that you must be willing to follow if you are going to serve as a juror in this case." The trial court also stated, "a person accused of a crime is presumed to be innocent of the charge against him." Rule 431(b) provides "the defendant is presumed innocent of the charge(s) against him or her." Rule 431(b)

uses the word "defendant," connecting the principle to Mr. Birge, the man on trial. But the trial court used the word "person," which does not connect the jury to Mr. Birge. Next, Rule 431(b) uses the word "charge(s)," and defendant was charged with "burglary and arson," but the trial court used the word "charge."

¶ 125    It is clear from the preceding that the trial court added words and changed words in Rule 431(b). Therefore, the majority is misrepresenting facts when it stated the trial court read Rule 431(b) verbatim. The trial court abused its discretion when it added words and changed words and failed to read the four principles verbatim, with numbers separating the principles, so the 32 jurors could distinguish between the four principles of law. It would be impossible for the trial court to determine the 32 jurors' beliefs and opinions from the Rule 431(b) admonishments that contained added words, changed words, and silent answers. Therefore, the trial court erred and abused its discretion when it failed to read the principles verbatim when it added its own words to the legal principles.

¶ 126    *8. The Trial Court Erred When It Abdicated Its Responsibility to Determine the 32 Jurors' Knowledge of the Four Principles and Their Biases and Prejudices by Permitting the 32 Jurors to Provide Silent, Nonverbal, Show-of-Hands Group Answers to the Two Compound Questions, Which Did Not Provide Information for the Court to Assess Credibility, and Therefore the Jurors' Silent, Nonverbal Answers Did Not Provide the Trial Court With Information to Make a Judicial Decision About the 32 Jurors' Impartiality*

¶ 127    The trial court has the obligation in the first instance to impanel an impartial jury. *Rosales-Lopez*, 451 U.S. at 189. The Supreme Court has held that

> "*[v]oir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. [Citation.]" *Id.* at 188.

- 37 -

¶ 128 I subscribe to the principle that it is "axiomatic that the greater the depth of the questions, the greater the opportunity to observe demeanor and the greater the quantum of information available to enable the trial judge to make an accurate assessment of credibility." Friedman, *supra*, at 941. " '[S]earching questioning of potential jurors . . . to screen out those with fixed opinions' " (emphasis omitted) (*Mu'Min*, 500 U.S. at 440 (Marshall, J., dissenting, joined by Blackmun and Stevens, JJ.) (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 564 (1976))) and content-based questions involving a juror's beliefs and opinions must be asked of prospective jurors for the trial court to fulfill its obligation. In this case, the trial court's failure to ask content-based questions—questions eliciting information from potential jurors about their beliefs and opinions—so that the court could determine the 32 jurors' impartiality made the trial court's Rule 431(b) admonishments an unreliable procedure for the court to determine each prospective juror's impartiality so that an impartial jury could determine defendant's guilt or innocence.

¶ 129 Raising one's hand in a group is at best the prospective juror's "*own* 'assurance[ ] that he is equal to [the] task' " but is not a substitute for a *judge's* determination the juror can be fair and impartial. (Emphasis in original.) *Id.* (quoting *Murphy v. Florida*, 421 U.S. 794, 800 (1975)). A prospective juror's own assurances " 'cannot be dispositive of the accused's rights.' " *Id.* (quoting *Murphy*, 421 U.S. at 800). The prospective jurors are not to make their own determination as to whether they understand the principles for themselves.

¶ 130 The determination of whether the jurors understand and can be impartial is the exclusive function of the trial court. *Murphy*, 421 U.S. at 800 ("the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights"). I agree with Justice Marshall's dissent in *Mu'Min*, where he stated that "the trial court must do more than elicit a simple profession of open-mindedness before swearing that person into the jury." *Mu'Min*, 500 U.S. at 440 (Marshall, J., dissenting, joined by Blackmun and Stevens, JJ.). By letting jurors determine their own understanding and impartiality, the trial court completely abdicated its duty to protect defendant's right to a fair trial by conducting a sufficient *voir dire* to empanel an unbiased jury.

¶ 131     The trial court erred and abused its discretion when it abdicated its duty to determine the prospective jurors' understanding and impartiality by permitting the prospective jurors to determine their own understanding of the principles and their own impartiality. When the trial court judge cannot make a judicial determination about each prospective juror's impartiality because the jurors have provided silent, nonverbal, show-of-hands group answers to the court's questions, the defendant has been denied his right to a fair trial.

¶ 132                    G. The Evidence Is Closely Balanced

¶ 133     The second question to be answered in a first prong plain-error analysis is whether the evidence is closely balanced. The eight errors I have identified establish that " 'a clear or obvious error occurred' " in this case. *People v. Sebby*, 2017 IL 119445, ¶ 48 (quoting *Piatkowski*, 225 Ill. 2d at 565). Next we must determine whether " 'the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant.' " *Id.* (quoting *Piatkowski*, 225 Ill. 2d at 565).

¶ 134     The State presented the testimony of two police officers who arrived on the scene within minutes of being alerted to smoke and flames coming from Chief City Vapor. Neither officer testified that they saw defendant enter or leave Chief City Vapor or start the fire. The State also presented an arson investigator as an expert. He opined that the fire was incendiary in origin and was caused by someone introducing an open flame to a couch inside the store. But he agreed with defense counsel that the source of the open flame that ignited the fire could have been the lighter found on the countertop in the store or an unfiltered lit cigarette left on the couch. Considering all the State's evidence, the State did not present any eyewitness testimony, or any forensic evidence, such as fingerprints or DNA (blood) or videos that connected defendant to the crimes charged.

¶ 135     Defendant testified that he did not burglarize or start the fire in Chief City Vapor. Defendant testified that, after he was released from the hospital for a drug overdose, his mother dropped him off at a gambling parlor. Defendant gambled at the parlor and then decided to walk over to this sister's house, which is located several blocks past Chief City Vapor. After no one answered the door at his sister's house, defendant started walking back to the gambling parlor. On his way back to

the gambling parlor defendant walked by Chief City Vapor, where, he testified, he picked up the hooded sweatshirt containing items the owner testified were removed from his store. Defendant testified that the items found in his possession when he was arrested were picked up off the sidewalk outside Chief City Vapor.

¶ 136    Without any eyewitness testimony, forensic evidence, or video evidence to connect defendant to the burglary or arson, and without any testimony to contradict defendant's statement that he picked up items from the store off the sidewalk near the store, this court has a case where it must determine whom to believe. A commonsense assessment of the evidence reveals that the evidence was closely balanced in this whom-to-believe case. *Id.* ¶¶ 61, 63.

¶ 137                    H. Rule 431(b) Is Facially Unconstitutional

¶ 138    Sometimes, "[i]n the exercise of its judicial responsibility, it is necessary *** for the Court to consider the facial validity" of a statute or rule when that argument has not been raised by the parties. *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 333 (2010); *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, ___,136 S. Ct. 2292, 2307 (2016). The due process clause of the fourth amendment to the United States Constitution "guarantees more than fair process; it offers heightened protection against government interference with certain fundamental rights and liberty interests." (Internal quotation marks omitted.) *In re N.G.*, 2018 IL 121939, ¶ 24 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997)). Although a Rule 431(b) violation does not itself "implicate a fundamental right or constitutional protection" (*Thompson*, 238 Ill. 2d at 614-15), criminal defendants do enjoy a fundamental right to a fair trial by an impartial jury. See *People v. Peeples*, 205 Ill. 2d 480, 517-18 (2002); *Kingston v. Turner*, 115 Ill. 2d 445, 466 (1987) (citing *People v. Gaston*, 125 Ill. App. 3d 7 (1984)).

¶ 139    Laws that interfere with or place an undue burden on constitutional rights may be facially unconstitutional. See *Whole Woman's Health*, 579 U.S. at ___, 136 S. Ct. at 2318 (holding Texas law facially unconstitutional where it placed an " 'undue burden' on [a] constitutional right"); *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (first amendment rights " 'may not constitutionally be abridged' " (quoting *Red Lion Broadcasting Co. v. Federal Communications Comm'n*, 395 U.S. 367, 390 (1969)); *Brown v. Louisiana*, 383 U.S. 131, 142 (1966) ("Interference with [a

constitutional] right, [properly] exercised, by state action is intolerable under our Constitution."). Our rules, like statutes, "must be construed to avoid an *** unconstitutional result." *In re Loss*, 119 Ill. 2d 186, 194 (1987). A rule will be deemed facially invalid if no set of circumstances exist under which the statute or rule would be constitutional. *Burns v. Municipal Officers Electoral Board of the Village of Elk Grove Village*, 2020 IL 125714, ¶ 13. A rule that " 'has the effect of placing a substantial obstacle in the path of a' " defendant's right to a fair trial by an impartial jury " 'cannot be considered a permissible means of serving its legitimate ends.' " See *Whole Woman's Health*, 579 U.S. at ___, 136 S. Ct. at 2309 (quoting *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 877 (1992)).

¶ 140 I believe we must ask whether the plain language of Rule 431(b) affords a criminal defendant the fair-trial protections, during *voir dire*, that he or she is entitled to under our constitutions or whether the current rule serves to deprive a criminal defendant of those rights and whether, therefore, Rule 431 is facially unconstitutional.

¶ 141 In *Rinehart*, this court stated:

"Because there is no precise test for determining which questions will filter out partial jurors [citation], the manner and scope of the examination rests within the discretion of the trial court, and we review such decisions for an abuse of discretion. An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, *the selection of a jury free from bias or prejudice*. [Citations.] Stated differently, a trial court does not abuse its discretion during *voir dire* if the questions create 'a reasonable assurance that any prejudice or bias would be discovered.' [Citation.]" (Emphasis added.) *Rinehart*, 2012 IL 111719, ¶ 16 (citing, *inter alia*, *People v. Clark*, 278 Ill. App. 3d 996, 1003 (1996)).

¶ 142 I believe the plain language of Rule 431 actually does "thwart[ ] the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice" (*id.*) and is therefore facially unconstitutional. The rule undermines the goals of *voir dire* in the following ways: the rule on its face (1) approves group questions; (2) permits silent, nonverbal, group answers; and (3) permits questions that lack content and, therefore, do not elicit information about each prospective juror so a

determination can be made about each prospective juror's qualifications to serve on a jury. The rule does not require a *voir dire* that elicits information about each juror's beliefs, opinions, biases, and prejudices in order to allow the removal of those prospective jurors who are biased or prejudiced to ensure an impartial jury is empaneled. See *Rosales-Lopez*, 451 U.S. at 188.

¶ 143     The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so the trial court can make a judicial determination of their qualifications to serve on a jury impartially and remove those prospective jurors whose minds are so closed by bias and prejudice that they cannot apply the law as instructed. See *Morgan*, 504 U.S. at 729 ("part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors"); *Wainwright*, 469 U.S. at 424; *Irvin*, 366 U.S. at 723. Rule 431(b) does not pass the *Morgan* test.

¶ 144     Rule 431(b) is intended to allow information to be elicited to protect a criminal defendant's right to a fair trial by an impartial jury. However, the current language of Rule 431(b) does not require the trial court to conduct a *voir dire* that requires the court to ascertain sufficient information about prospective jurors to enable the court to protect that right or so that attorneys can make informed decisions about the use of their peremptory challenges. *Clark*, 278 Ill. App. 3d at 1003 ("purpose of *voir dire* is to enable the trial court to select an impartial jury and to ensure that the attorneys have an informed and intelligent basis on which to exercise peremptory challenges" (citing, *inter alia*, *Mu'Min*, 500 U.S. at 431)).

¶ 145     Rule 431(b) does not require that Illinois trial courts engage in constitutionally mandated *voir dire* that ensures a defendant receives a fair trial before an impartial jury. *Morgan*, 504 U.S. at 729-30; see also *Skilling*, 561 U.S. at 385-95 (addressing the argument *voir dire* did not adequately detect and defuse juror bias). Because Rule 431(b) permits group questioning and silent group answers and does not ensure that defendants receive a fair trial before an impartial jury, the rule should be amended. In light of the facial infirmities of Rule 431(b), I would find Rule 431 unconstitutional.

¶ 146                    I. Remedies to the *Voir Dire* Procedure

¶ 147    First, to comply with the constitution's guarantee of a defendant's right to a fair trial before an impartial jury, I would amend Rule 431(b) by requiring the trial court to ask content-based individual questions of each juror. The constitutional guarantee of a fair trial includes the defendant's right to an adequate *voir dire*, which means the trial court asks questions of the jurors with content designed to elicit information to identify and remove those prospective jurors who will not be able to impartially follow the court's instructions and evaluate the evidence in the case.

¶ 148    Second, the amended Rule 431(b) should not only prohibit group questions but should also prohibit silent, nonverbal, show-of-hands answers. As previously pointed out, silent, nonverbal, show-of-hands answers do not provide the court with any information about the individual juror's beliefs and opinions so the court can determine each juror's biases and prejudices and can use that information to remove those jurors who cannot be impartial and give the defendant a fair trial.

¶ 149    Third, the amended Rule 431(b) should prohibit questions that ask jurors whether they understand the four principles. The determination as to whether a juror understands the principles is not a juror determination but a judicial determination. By permitting the jurors to assess their own understanding, Rule 431(b) currently permits the jurors to invade the province of the judge and denies the defendant his right to a fair trial.

¶ 150    Fourth, the amended Rule 431(b) should include a definition of proof beyond a reasonable doubt. Proof beyond a reasonable doubt is a principle that lay people have difficulty understanding (how much evidence the State must present to convict a defendant of a crime). Commentators have made it clear that jurors and even law students have problems understanding legal principles. Commentators have also pointed out that 39 other states explain the concept of reasonable doubt:

> "Currently, the state courts are split on the issue of whether to define reasonable doubt. Illinois is in the minority of jurisdictions that admonish trial courts from defining the term reasonable doubt, even when asked by the jury for guidance. Only 10 other states find themselves in agreement with Illinois' position. As for the remaining 39 states, they leave the decision to define the term up to the trial court if there is no pattern jury instruction. The Federal Courts are also split as to defining reasonable doubt." Bobby Greene,

*Reasonable Doubt: Is It Defined by Whatever Is at the Top of the Google Search Page?*, 50 J. Marshall L. Rev. 933, 941 (2017).

See also Timothy James Ting, *It's Time to Define "Beyond a Reasonable Doubt"*, 106 Ill. B.J. 24 (2018); O'Neill, *supra*.

¶ 151    Therefore, because Illinois is in the minority of jurisdictions that do not define reasonable doubt, I would define the principle in order to ensure the principle is applied properly by jurors and to ensure that every defendant receives a fair trial.

¶ 152    Finally, I would amend Rule 431(b) by mandating that a pretrial questionnaire be sent prior to trial to every prospective criminal trial juror. See State v. Chauvin, No. 27-CR-20-12646 (Dist. Ct. Hennepin County, Minn.), Special Juror Questionnaire, https://www.mncourts.gov/mncourtsgov/media/High-Profile-Cases/27-CR-20-12646/JurorQuestionnaire12222020.pdf (Dec. 22, 2020) [https://perma.cc/F5TW-39ML] (reprinted in full in appendix A, *infra*); see also Race IAT, Project Implicit, https://implicit.harvard.edu/implicit/selectatest.html [https://perma.cc/BB9Z-3TJU] (last visited Feb. 11, 2021) (excerpt from the Race IAT (Implicit Association Test) gauging implicit racial bias reprinted in appendix B); see also Illinois Pattern Jury Instructions, Civil, No. 1.08 (approved May 2018) (Implicit Bias). The pretrial questionnaire can be used to familiarize jurors with legal principles, *e.g.*, proof beyond a reasonable doubt, the presumption of innocence, and implicit and unconscious bias. See Anna Roberts, *(Re)forming the Jury: Detection and Disinfection of Implicit Juror Bias*, 44 Conn. L. Rev. 827 (2012); Michael B. Hyman, *Implicit Bias in the Courts*, 102 Ill. B.J. 40 (2014); Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 UC Irvine L. Rev. 843 (2015). The pretrial questionnaire can also be used to elicit information about each juror's beliefs and opinions and would assist the court and the attorneys in examining jurors during *voir dire*. This court can take judicial notice of the fact that the United States incarcerates more people than any other country in the world and that the largest percentage of the people incarcerated are people of color. See E. Ann Carson, U.S. Dep't of Justice, *Prisoners in 2018* (Apr. 2020), https://www.bjs.gov/content/pub/pdf/p18.pdf [https://perma.cc/S2NF-3PKG]. In light of the aforementioned facts, absent a discussion of implicit bias with each juror during *voir dire*, there is an impermissible risk that jurors' individual biases will influence their jury deliberations. Finally, I make the aforementioned suggestions in order to

ensure that every criminal defendant receives equal protection of the laws. See, *e.g.*, *Rivera v. Illinois*, 556 U.S. 148, 161 (2009).

¶ 153                                III. CONCLUSION

¶ 154    In sum, the trial court exercised its discretion to implement and execute Rule 431 and followed the procedure prescribed by the plain text of the rule and this court's interpretation of the rule. In doing so, the trial court in this case committed eight errors that singularly and in combination denied defendant his right to a fair trial by an impartial jury. See *Ristaino v. Ross*, 424 U.S. 589, 595-96 (1976) (and cases cited therein, stating that in *Ham v. South Carolina*, 409 U.S. 524 (1973), the Court "recognized that some cases may present circumstances in which an impermissible threat to the fair trial guaranteed by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during *voir dire*" and holding that view was "consistent with other determinations *** that a State had denied a defendant due process by failing to impanel an impartial jury"). Currently, Rule 431 permits group questioning of jurors, permits jurors to give silent, nonverbal, group answers to questions, and permits compound questions—which confuse jurors and produce incomprehensible answers—during *voir dire*. The current rule is also unconstitutional because it does not mandate individual questioning of jurors about their beliefs and opinions so the court can make a judicial determination of each juror's impartiality and ensure the defendant receives a fair trial. The amended rule must mandate that the trial judge's questions to the jurors are content-based, dependent upon the facts of the case, so that the trial court and this court have information that permits a judicial determination about each juror's qualifications to serve as an impartial juror.

¶ 155    This court must codify and promulgate a procedure that complies with the constitution and protects a defendant's right to a fair trial by an impartial jury. To comply with the constitution, the amended rule must prohibit group *voir dire* and mandate individualized content-based questioning of each juror so that the trial court and this court have a basis upon which to gauge each prospective juror's credibility and qualifications to serve impartially on a jury. Finally, the amended rule must mandate that the judge is the only person who makes the decision as to each juror's qualifications to serve and specifically prohibit relying exclusively on

"the juror's assurances that he [or she] is equal to this task." *Murphy*, 421 U.S. at 800 ("the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights").

¶ 156     In my opinion, the record does not establish that Mr. Birge received a fair trial before an impartial jury because the *voir dire* in this case was structurally defective. Therefore, I would reverse the judgment of the appellate court, reverse defendant's conviction, and remand the case for a new trial. Consequently, I respectfully dissent.

27-CR-20-12646

District Court Use Only: _____

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

## MINNESOTA JUDICIAL BRANCH
FOURTH JUDICIAL DISTRICT • HENNEPIN COUNTY

## Hennepin County Special Juror Questionnaire

You are a potential juror in the trial of four former police officers charged in connection with the death of George Floyd. From this day forward, DO NOT read or intentionally view anything about these cases or do any investigation or research related to these cases.

The information in this questionnaire is for the judge and attorneys that will be involved in this trial and is required information. This questionnaire will be filed as a public document in the court record at the end of the trial, but until then, your name and the fact that you are a potential juror will NOT be public. For that reason, DO NOT disclose to anyone that you are a potential juror in this case.

***PLEASE USE BLACK PEN ONLY AND DO NOT WRITE ON THE BACK OF ANY PAGE.

***YOU MUST RETURN THIS SHEET AND THE COMPLETED QUESTIONNAIRE BY JANUARY 2, 2021.

     Your Juror Identification Number (9 digits): _____

     Your Full Name: _____

     Your Phone Numbers (cell, work and home): _____

     Your Email Address: _____

You should bring a picture ID with you when you come to court for the first time.

Your contact information will remain confidential and available only to District Court staff. The parties and attorneys for the parties will have access to your name, but will refer to you in the courtroom by a random number to be assigned by District Court. Contact the District Court Jury Office at (612) 348-3158 if you have any questions.

By returning the completed questionnaire, you are declaring under penalty of perjury that everything you have stated in this document is true and correct.

I understand and do so declare.

Sign Here: _____

Signed on this date _____ in _____ County.

1

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

State of Minnesota,

        Plaintiff,

vs.

Derek Michael Chauvin,
Tou Thao,
Thomas Kiernan Lane ,
J. Alexander Kueng,

        Defendants.

**SPECIAL JUROR QUESTIONNAIRE**

Dist Ct. File 27-CR-20-12646
Dist Ct. File 27-CR-20-12949
Dist Ct. File 27-CR-20-12951
Dist Ct. File 27-CR-20-12953

Please answer all of the questions as completely and honestly as you can. You must answer all questions, but you may answer "PRIVATE" if disclosure of some of your past experiences would be particularly sensitive, traumatic, or embarrassing and the judge will address those questions in court as privately as possible. As you answer these questions, please keep in mind that there are no "right" or "wrong" answers, but you are answering these questions under oath and YOU WILL BE REQUIRED TO VERIFY UNDER OATH THAT YOUR ANSWERS ARE TRUE WHEN YOU COME TO COURT FOR THE FIRST TIME.

***Extra blank pages are attached if you need additional room for answers***

## PART I.  KNOWLEDGE OF THE CASE

On May 25, 2020, George Floyd died after an interaction with Minneapolis Police.  The charges in this case stem from that incident.

2

- 48 -

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

1. What do you know about this case from media reports?

**IT IS IMPORTANT FOR THE PARTIES TO KNOW <u>ALL</u> OF THE DETAILS YOU REMEMBER ABOUT THESE EVENTS, THE CASE, GEORGE FLOYD, AND DEFENDANTS DEREK CHAUVIN, TOU THAO, J. ALEXANDER KUENG AND THOMAS LANE. PLEASE TAKE YOUR TIME TO SEARCH YOUR MEMORY AND PROVIDE A FULL ACCOUNT OF WHAT YOU RECALL FROM WHAT YOU HAVE HEARD OR SEEN IN THE MEDIA.** THIS WILL HELP TO SHORTEN THE JURY SELECTION PROCESS.

3

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

1. From what you have seen, read, or heard, do you have a general impression of the defendants?
☐ Very negative  ☐ Somewhat negative  ☐ Neutral  ☐ Somewhat positive
☐ Very positive  ☐ Other:
Why do you feel that way?

3. From what you have seen, read, or heard, do you have a general impression of George Floyd?
☐ Very negative  ☐ Somewhat negative  ☐ Neutral  ☐ Somewhat positive
☐ Very positive  ☐ Other:
Why do you feel that way?

4. Do you, or someone close to you, have any direct or indirect connections to these events?
☐ Yes ☐ No  If yes, please explain:

5. Have you ever watched video of George Floyd's death on the news or the Internet? ☐ Yes ☐ No
If yes, how many times have you seen videos from the incident, **in whole or in part**, on TV or on the Internet?  ☐ 1 time ☐ 2-3 times  ☐ 4-5 times  ☐ 6 or more times

6. Have you ever talked about George Floyd's death with your family, friends, or co-workers, or discussed it online, for example, on social media? ☐ Yes ☐ No
If yes, what opinions have you expressed?

7. Did you, or someone close to you, participate in any of the demonstrations or marches against police brutality that took place in Minneapolis after George Floyd's death?  ☐ Yes, me ☐ Yes, someone close to me ☐ No.
If you participated, explain how much you were involved

If you participated, did you carry a sign? What did it say?

4

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

8. Did you or someone you know get injured or suffer any property damage during the protests that took place after George Floyd's death? ☐ Yes ☐ No

9. Do you believe your community has been negatively or positively affected by any of the protests that have taken place in the Twin-Cities area since George Floyd's death?

10. No matter what you have heard or seen about this case, and no matter what opinions you might have formed, can you put all of that aside and decide this case only on the evidence you receive in court, follow the law, and decide the case in a fair and impartial manner?

## PART II. MEDIA HABITS

1. What is your primary source of news?

2. How often do you read a hard copy or online version of a newspaper? ☐ Every day ☐ Several times a week ☐ Once or twice a week ☐ Less often than once a week ☐ Never

3. What newspapers do you regularly read?

4. What podcasts do you regularly listen to?

5. How often do you listen to local news on the radio or watch news on television? ☐ Every day ☐ Several times a week ☐ Once or twice a week ☐ Less often than once a week ☐ Never

6. Which local radio or television news station do you listen to or watch most?

7. How often do you see local news or news related updates on social media sites such as Facebook or Twitter? ☐ Every day ☐ Several times a week ☐ Once or twice a week ☐ Less often than once a week ☐ Never

8. What social media platforms do you use regularly, if any?

5

- 51 -

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

### PART III.  POLICE CONTACTS

1  The defendants in this case were officers for the Minneapolis Police Department.  Is there anything about their employment with the MPD that would prevent you from rendering a fair and impartial verdict in this case?

2  Do you have regular contact with any law enforcement agencies, employees, or officers through your work, your neighborhood, or in your social life?
   If "Yes," please explain:

3  Have you, or someone close to you, ever helped support or advocated in favor of or against police reform?  If "Yes," please explain:

4.  Have you, or someone close to you, ever been arrested for a crime?      ☐ Yes ☐ No

   If yes, how did the police handle the arrest? ☐ They acted professionally   ☐ They acted unprofessionally ☐ They were verbally abusive ☐ They used excessive force ☐ I don't know

5.  Have you, or someone close to you, ever been the victim of a crime where the police were called?
   ☐ Yes ☐ No      If "Yes," please explain the circumstances:

6.  Were you satisfied or unsatisfied with how the police responded? ☐ Very satisfied ☐ Somewhat satisfied ☐ Neutral ☐ Somewhat unsatisfied ☐ Very unsatisfied ☐ I don't know

7.  Have you ever personally seen the police use more force than was needed?    ☐ Yes ☐ No
   If "Yes," please explain:

6

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

8. Have you ever been restrained or put in a chokehold, for example, by law enforcement or during a self-defense class? ☐ Yes ☐ No  If "Yes," please explain:

9. Please circle the choice that reflects your honest opinion:

|  |  | Strongly Agree | Somewhat Agree | No Opinion | Somewhat Disagree | Strongly Disagree |
|---|---|---|---|---|---|---|
| a. | Discrimination is not as bad as the media makes it out to be. | 1 | 2 | 3 | 4 | 5 |
| b. | Blacks and other minorities do not receive equal treatment as whites in the criminal justice system. | 1 | 2 | 3 | 4 | 5 |
| c. | Police in this country treat whites and blacks equally. | 1 | 2 | 3 | 4 | 5 |
| d. | Police in my community make me feel safe. | 1 | 2 | 3 | 4 | 5 |
| e. | I support defunding the Minneapolis Police Department. | 1 | 2 | 3 | 4 | 5 |
| f. | Minneapolis police officers are more likely to respond with force when confronting black suspects than when dealing with white suspects. | 1 | 2 | 3 | 4 | 5 |
| g. | Because law enforcement officers have such dangerous jobs, it is not right to second guess decisions they make while on duty. | 1 | 2 | 3 | 4 | 5 |
| h. | The criminal just system is biased against racial and ethnic minorities. | 1 | 2 | 3 | 4 | 5 |
| i. | I do not trust the police. | 1 | 2 | 3 | 4 | 5 |
| j. | People today do not give our law enforcement officers the respect they deserve. | 1 | 2 | 3 | 4 | 5 |
| k. | Local police departments try to cover up excessive force rather than correct it. | 1 | 2 | 3 | 4 | 5 |
| l. | I think that news reports about police brutality against racial minorities is only the tip of the iceberg. | 1 | 2 | 3 | 4 | 5 |

10. Have you ever been trained on how to restrain someone or use a chokehold? ☐ Yes ☐ No

11. Do you have any martial arts training or experience? ☐ Yes ☐ No

7

- 53 -

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

12. Other than what you have already described above, have you, or anyone close to you, participated in protests about police use of force or police brutality?    ☐ Yes ☐ No

13. How favorable or unfavorable are you about Black Lives Matter? ☐ Very favorable ☐ Somewhat favorable ☐ Neutral ☐ Somewhat unfavorable ☐ Very unfavorable.    Please explain your choice:

14. How favorable or unfavorable are you about Blue Lives Matter? ☐ Very favorable ☐ Somewhat favorable ☐ Neutral ☐ Somewhat unfavorable ☐ Very unfavorable.    Please explain your choice:

## PART IV.  PERSONAL BACKGROUND

1.   Age\Gender:

2.   Highest level of education you have completed (list any degrees and areas of study for any education beyond high school)?

3.   Your Work Status (Full-time, Part-Time, Self-employed, Disabled,   Student, Retired, etc.)?  Your occupation\employer?

4.   Previous five positions or occupations (only if within last 10 years)?

5.   What city do you live in and how long have you lived there?

8

- 54 -

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

6. Please list other cities or states you have lived in and approximately how long: (include up to 5 most recent places)

7. Marital status?

8. Spouse or partner's work status (Full-time, Part-Time, Self-employed, Disabled, Student, Retired, etc.)? Occupation\employer?

9. Highest level of education completed by spouse or partner (list any degrees and areas of study beyond high school)?

10. What are the ages, genders and work of your children if you have any?

11. Have you ever served in the military? If so, please list Branch, Highest Rank, Approximate Dates of Service and whether you served in combat.

12. Do you, or anyone close to you, have any training or experience (work or volunteer) in the following areas?

| | No | Yes | Please Provide Limited Details |
|---|---|---|---|
| Law | ☐ | ☐ Self  ☐ Spouse <br> ☐ Family <br> ☐ Close Friend | |
| Law enforcement | ☐ | ☐ Self  ☐ Spouse <br> ☐ Family <br> ☐ Close Friend | |
| Criminal justice or criminology | ☐ | ☐ Self  ☐ Spouse <br> ☐ Family <br> ☐ Close Friend | |
| Forensic Science | ☐ | ☐ Self  ☐ Spouse <br> ☐ Family <br> ☐ Close Friend | |

9

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

| Medicine or Healthcare | ☐ | ☐ Self ☐ Spouse ☐ Family ☐ Close Friend | |
|---|---|---|---|
| Counseling, Psychology or Mental Health | ☐ | ☐ Self ☐ Spouse ☐ Family ☐ Close Friend | |
| Civil Rights or Social Justice Issues | ☐ | ☐ Self ☐ Spouse ☐ Family ☐ Close Friend | |

13. Have you, or anyone close to you, had any of the following experiences?

| | No | Yes | Please Provide Limited Details |
|---|---|---|---|
| Victim of Crime? | ☐ | ☐ Self ☐ Spouse ☐ Family ☐ Close Friend | |
| Accused of a Crime? | ☐ | ☐ Self ☐ Spouse ☐ Family ☐ Close Friend | |
| Struggle with Drug Addiction? | ☐ | ☐ Self ☐ Spouse ☐ Family ☐ Close Friend | |

14. Would any of the experiences you noted above make it difficult for you to be fair and impartial? If so, why?

15. Have you had any of the following court experiences?

| | No | Yes | Please Provide Limited Details |
|---|---|---|---|
| Served on a jury in a criminal case? | ☐ | ☐ | |
| Served on a jury in a civil case? | ☐ | ☐ | |
| Testified as a witness in a court case? | ☐ | ☐ | |
| Served on a grand jury? | ☐ | ☐ | |

10

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

| Worked for the judicial branch? | ☐ | ☐ | |
|---|---|---|---|

16. Would any of the experiences you noted above make it difficult for you to be fair and impartial? Is so, why?

17. Please list any hobbies or special interests you have:

18. Please list any organizations you have belonged to or in which you participate, including as an active volunteer or financial supporter. This could include veterans groups, service clubs, social clubs, unions, professional, volunteer, neighborhood, educational or political groups.

## PART V. OPINIONS REGARDING JUSTICE SYSTEM

1. Do you believe that the jury system in this country is a fair system? Why or why not?

2. Do you believe our criminal justice system works? Why or why not?

3. Under our system of justice, defendants are presumed innocent of the criminal charges against them. Would you have any difficulty following this principle of law?

11

- 57 -

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

4. Under our system of justice, the prosecution has the burden of proving the defendant guilty beyond a reasonable doubt. Would you have any difficulty following this principle of law?

5. Under our system of justice, defendants have the right to remain silent, and if they exercise that right, their silence is not to be used against them. Would you have any difficulty following this principle of law?

6. Under our system of justice, the potential consequences of your verdict, including potential penalty or punishment, must not in any way affect the jury's decision as to whether or not the prosecution has proven the defendant guilty beyond a reasonable doubt. Would you have any difficulty following this principle of law?

7. Under our system of justice, the jury must decide the case solely on the evidence produced in court and the law that the judge instructs, and not because of bias, passion, prejudice, or sympathy. Would you have difficulty following this principle of law?

## PART VI. TRIAL LENGTH AND ABILITY TO SERVE

1. Our best prediction is that jury selection will last from March 8, 2021 to March 26, 2021. You will have to appear at the Hennepin County Government Center for 1-2 days in that timeframe (your time to appear will be assigned later). If you are selected for the jury in this case, you will have to appear every weekday starting March 29, 2021 until trial and deliberations are finished (estimated to be three to four weeks). Is there any significant hardship or reason why you cannot serve during this time period?

2. During jury deliberation (and possibly for part of the trial), the jury will be sequestered. That means the jury will work into the evenings and be taken to a hotel to stay overnight. Is there any reason you cannot be sequestered overnight?

12

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

3. Secure parking will be provided for jurors, free of charge. Are you able to drive yourself, or have someone drop you off each day?

4. How difficult do you think it would be for you to evaluate graphic photographs or video, including photos and video of a person who has died?

5. The jury is told not to read, watch, or listen to news accounts of a trial they are involved in until it is over, and not to talk to anyone about the case, not even to one another, and to not post anything on social media or elsewhere, including through jury deliberations. Would you find it difficult to follow these instructions for any reason?

6. Is there a reason why you would not be able to give your complete attention to a trial during your time as a juror?

7. Do you have any religious or philosophical beliefs, which would make it difficult for you to be a juror?

8. Do you have any medical, visual, hearing, physical, or other impairment that may affect your ability to serve as a juror on this case?

9. Is there any other reason that you could not be a fair and impartial juror in this case? If yes, please explain.

13

- 59 -

Filed in District Court
State of Minnesota
12/22/2020 12:14 PM

District Court Use Only: _____

10. Is there anything else the judge and attorneys should know about you in relation to serving on this jury?

11. Do you want to serve as a juror in this case? □ Yes □ No □ Not Sure

12. Why do you feel that way about serving as a juror in this case?

14

27-CR-20-12646

District Court Use Only: _____

15

27-CR-20-12646

Filed in District Court
State of Minnesota
13/22/2020 12:14 PM

District Court Use Only: _____

16

Experiment                                    https://implicit.harvard.edu/implicit/Study?tid=-

## Questionnaire

Page 1 out of 3

Which statement best describes you?

I strongly prefer White people to Black people.

I moderately prefer White people to Black people

I slightly prefer White people to Black people.

I like White people and Black people equally.

I slightly prefer Black people to White people.

I moderately prefer Black people to White people.

I strongly prefer Black people to White people.

Tip: For quick response, click to select your answer, and then click again to submit.

Decline to Answer

Submit

1 of 1                                              2/10/2021, 2:06 PM