NOTICE

Decision filed 11/18/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190141-U

NO. 5-19-0141

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 18-CF-195 |
| | ) | |
| DARIEN McKINNEY, | ) | Honorable |
| | ) | Kevin S. Parker, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's conviction is affirmed where the evidence presented at trial was not closely balanced, and, thus, the defendant cannot establish that the trial court's failure to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) constituted plain error.

¶ 2    This is a direct appeal from the circuit court of Effingham County. The defendant, Darien McKinney, was convicted of predatory criminal sexual assault of a child. On November 20, 2018, he was sentenced to 12 years' imprisonment followed by 3 years of mandatory supervised release (MSR). On appeal, the defendant argues that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4    On June 20, 2018, the defendant was charged by indictment with one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)).  It was alleged that the defendant, who was over 17 years old, knowingly committed an act of sexual contact with the victim, J.S., who was under 13 years of age, when he touched the victim's vagina with his finger for the purpose of his sexual arousal.

¶ 5    On October 1, 2018, the defendant's two-day jury trial commenced.  During jury selection, the trial court asked jurors questions relating to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).  The court explained that it would explain a few general legal propositions.  The court posed its questions to the panel as a whole, asking for potential jurors to raise their hands "if there is anyone that has a quarrel or can't accept this legal proposition."  The court continued:

> "[T]he Defendant, Mr. McKinney, is presumed innocent of the charges against him. Does anybody have a quarrel with that legal proposition that Mr. McKinney is presumed innocent?
> Before Mr. McKinney can be convicted, the State must prove the Defendant guilty beyond a reasonable doubt.  Does anybody have a quarrel with that legal proposition?
> The Defendant is not required to offer any evidence on his own behalf.  Does anybody have a quarrel with that?"

¶ 6    During the State's case-in-chief, Officer Joshua Douthit of the Effingham Police Department testified that on May 21, 2018, he responded to a dispatch request for an officer to meet with an individual, later identified as the defendant, in the lobby of the police department. The defendant went to the police department voluntarily to report a Facebook post that was alarming and apparently about him.  After the defendant showed him the

Facebook post and provided his explanation of it, Douthit asked follow-up questions, created a report, and handed the case over to investigators.

¶ 7    Detective Corporal Darin Deters of the Effingham County Sheriff's Office testified that he assisted in the defendant's interview.  Prior to entering the interview, Deters was informed that the defendant was being questioned about an allegation made on Facebook.  The Facebook post was made by the victim, whom the defendant knew through her uncle.  The victim and her uncle had lived with the defendant about three years prior to the interview.  Deters reviewed the lengthy Facebook post, which detailed situations where the victim wore diapers in the defendant's presence.  In the first hour of the interview, the defendant denied the allegations but acknowledged knowing and living with the victim.  However, the defendant admitted to having a diaper fetish, in that he enjoyed wearing diapers and used them for therapeutic reasons.  The defendant also said he subscribed to a website called "Fetlife."  He admitted engaging in "diaper play" with other women, with three of those relationships involving sexual intercourse.  The defendant admitted that he liked seeing women wearing diapers.

¶ 8    Deters explained that after an hour or so, the defendant's demeanor changed, and he began to cry.  He then admitted to having the victim put a diaper on in his presence at least three times.  The victim would take off all her clothes, be completely nude, and put on a diaper.  The defendant indicated that on some occasions, the two of them would just talk.  Another time, he cradled her like a baby and fed her soda from a plastic baby bottle.  The defendant admitted to having an erection during this encounter.  He also admitted that on one occasion, the victim wet her diaper, so he removed it and wiped the outside of her

vagina with a baby wipe. The defendant denied having sexual intercourse with the victim, but he spoke in detail about her breasts. During this time, the victim was around 12 or 13 years old. The defendant was 30 years old at the time of his interview.

¶ 9    Officer Aaron Lange of the Effingham Police Department testified that he was also present during the defendant's interview. Lange agreed that the interview had two distinct segments: (1) the first hour where the defendant denied involvement in the allegations and (2) the remaining time where he admitted to certain allegations. The State specifically asked whether, during the first half of the interview, the defendant explained a "weird fetish that he had?" Lange responded in the affirmative. The defendant showed Lange the Fetlife website, which appeared to be pornography, and admitted to using Fetlife to discuss or engage in his diaper fetish with others. Lange said that after about the first hour of the interview, the defendant began to cry and sob; he then admitted that the victim completely undressed and put a diaper on in front of him. The defendant said this happened on three occasions. A video clip was played for the jury, and Lange indicated that the clip showed the defendant admitting that he was aroused during these three occasions and had an erection during one encounter. However, the defendant continued to deny that the "diaper play" with the victim was sexual in nature.

¶ 10    During her testimony, the victim described her interactions with the defendant and how the alleged events came to occur. In 2015, when the victim was 12 years old, she and her uncle moved into the house where the defendant was living. She and the defendant would have personal conversations about their lives, she trusted him, and she would go to him when she needed to vent. Around May 2015, their relationship became physical. The

4

victim recalled she was having a rough day, and the defendant mentioned a "counseling thing" that he thought would help her. He said "he would treat [her] like a baby and [they] would do baby things." The "counseling sessions" took place in his bedroom. During the encounters, the defendant took off her pants and undergarments, wiped her vagina with a baby wipe, sprinkled baby powder on her, and put a diaper on her. When she wore a diaper, he would cradle her in his arms and feed her soda with a baby bottle. The defendant would also wipe her vagina when he took off her diaper.

¶ 11    On one occasion, the defendant told the victim to take off her shirt because he wanted her completely naked. The victim did not want to, but the defendant insisted that it was okay and said she was beautiful. He kept asking, so she let him take off her shirt. He then hugged her and again said she was beautiful. She slept in a crib in his room that night. The victim recalled that she had maybe 10 sessions with the defendant. At first, she was apprehensive about them, but she wanted to believe that they were helping her as the defendant insisted. She said the defendant told her they could stop at any time, but she could come to him if she ever wanted to talk. On cross-examination, the victim testified that she was only fully naked once, and the defendant never took his clothes off, exposed himself to her, or made her touch him.

¶ 12    The defendant testified in his own defense. He described his difficult upbringing, including that his stepmother would shop around for doctors who would prescribe him medications. The defendant recalled having problems with wetting the bed and needing diapers to combat the problem. The defendant met the victim when she and her uncle moved into the house where he was living. Eventually, the victim and the defendant

5

bonded over their difficult childhoods and lack of parental figures. The defendant testified that he found the Fetlife website and started wearing diapers to calm him down. He described relationships he had with women who agreed to wear diapers with him.

¶ 13 The defendant described the incidents when the victim would wear a diaper; he testified that he recommended it to her for therapeutic purposes. The defendant testified that he did not want to overstep any boundaries and always asked the victim if she felt comfortable. The first time she wore a diaper, they just talked for about 30 minutes, and he fed her soda from a baby bottle. He claimed that he did not engage in this activity for arousal, but because the victim was depressed, and he thought it would help. He testified that when he was by himself wearing a diaper, he was not sexually aroused, did not view pornography, did not sexually stimulate himself, and did not use any sex toys. He denied wearing a diaper during any kind of sexual activity with his adult sexual partners.

¶ 14 On cross-examination, the defendant admitted that he had a blowup doll, a bag of soiled diapers, and an adult onesie in his bedroom. The defendant also admitted that he was a member of the Fetlife website, but claimed he only used it to reach out and talk to other people interested in diaper play, not for sexual purposes. He admitted taking the victim's clothes off of her during their first session. Although he admitted wiping her vagina with a baby wipe, he claimed that it only happened once. The defendant testified that he had all but one of his past girlfriends wear diapers. Like the victim, they all had emotional issues and that was how he approached them about wearing the diapers. He also had sexual relations with them. The defendant confirmed that, during his interview, he said he was aroused during his interactions with the victim. The State also asked the

defendant to confirm that he told police he had an erection, to which the defendant replied, "More or less, I didn't—it wasn't fully erect." He then admitted that this answer was different from what he told the police during his interview.

¶ 15 The State recalled Lange to testify as a rebuttal witness. He was asked about the defendant's response when the detectives questioned him as to whether he engaged in sexual intercourse with the victim. Lange testified, "He said that one thing led to another and that it was stopped just before they did the one thing that would destroy the both of them."

¶ 16 The jury found the defendant guilty of predatory criminal sexual assault of a child. The defendant was sentenced to 12 years' imprisonment followed by 3 years of MSR.

¶ 17 The defendant filed his notice of appeal on April 4, 2019.

¶ 18                                II. ANALYSIS

¶ 19 The defendant's sole contention on appeal is that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*. He concedes that he did not raise this issue during trial or in a posttrial motion but argues that the error is subject to plain-error review because the evidence in this case was closely balanced. The State responds that the defendant is not entitled to plain-error relief because the evidence was not closely balanced. We agree with the State's position.

¶ 20 Rule 431(b) requires that the trial court ask all potential jurors whether they understand and accept four fundamental principles of criminal law: (1) that defendant is presumed innocent of the charges against him, (2) that the State must prove defendant guilty beyond a reasonable doubt, (3) that defendant is not required to offer any evidence

7

on his own behalf, and (4) that defendant's decision to not testify cannot be held against him. *Id*. These four principles are commonly referred to as the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472 (1984). Rule 431(b) mandates

> "a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on their understanding and acceptance of those principles." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 21 However, there is no requirement that the trial court recite a principle and then question each potential juror on that individual principle. *People v. Birge*, 2021 IL 125644, ¶ 34. "Under the plain language, a court complies with Rule 431(b) if it (1) instructs the prospective jurors on the four principles, (2) asks if the prospective jurors understand those principles, and (3) asks if the prospective jurors accept those principles." *Id.*

¶ 22 The plain-error doctrine allows a reviewing court to consider an unpreserved error when a clear or obvious error occurred and the evidence at trial was closely balanced or that error was so egregious as to deny defendant a fair trial. *Thompson*, 238 Ill. 2d at 613. The first step in plain-error review is to determine whether any error has been committed at all. *Id*.

¶ 23 Here, the trial court said to the potential jurors that it would explain a few general legal propositions. The court posed the questions to the panel as a whole and asked potential jurors to raise their hands "if there is anyone that has a quarrel or can't accept this legal proposition." The court continued:

"[T]he Defendant, Mr. McKinney, is presumed innocent of the charges against him. Does anybody have a quarrel with that legal proposition that Mr. McKinney is presumed innocent?

Before Mr. McKinney can be convicted, the State must prove the Defendant guilty beyond a reasonable doubt. Does anybody have a quarrel with that legal proposition?

The Defendant is not required to offer any evidence on his own behalf. Does anybody have a quarrel with that?"

Thus, the record is clear that the court failed to instruct the prospective jurors that if a defendant does not testify it cannot be held against him, and it failed to ask the prospective jurors if they understood the relevant legal principles. In this regard, the court clearly erred in failing to comply with Rule 431(b). See *Birge*, 2021 IL 125644, ¶ 34.

¶ 24    Having concluded that there was a clear error, we must determine whether the evidence was closely balanced. When determining whether the evidence was closely balanced, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of that evidence within the context of the case. *People v. Sebby*, 2017 IL 119445, ¶ 53.

¶ 25    In this case, Deters and Lange testified as to their interview of the defendant. Their testimony revealed that the Facebook post that initiated this investigation detailed situations where the victim wore diapers in the defendant's presence. The interview had two distinct segments: (1) the first hour where the defendant denied involvement in the allegations in the Facebook post and (2) the remaining time where the defendant admitted to certain allegations. In the first hour, although the defendant denied the allegations, he explained his diaper fetish and that he subscribed to the Fetlife website. The website appeared to be pornography, and the defendant used it to discuss or engage in his diaper

fetish with others. He had engaged in "diaper play" with other women, three of those occasions involved sexual intercourse, and he liked seeing women wearing diapers.

¶ 26 Over an hour into the interview, the defendant's demeanor changed, and he started to cry. He then admitted to having the victim wear a diaper in his presence on at least three occasions. She would take off all her clothes, be completely nude, and put on a diaper. During one encounter, he cradled her like a baby and fed her soda from a plastic baby bottle. He admitted to having an erection during this encounter. On another occasion, the victim wet her diaper, so he removed it and wiped the outside of her vagina with a baby wipe. He denied having sexual intercourse with the victim, but he spoke in detail about her breasts. In the video clip played for the jury, the defendant admitted that he was aroused during these three occasions and had an erection during one encounter. The defendant denied that the "diaper play" with the victim was sexual in nature. However, when asked during his interview whether he engaged in sexual intercourse with the victim, the defendant stated, "one thing led to another," and they "stopped just before they did the one thing that would destroy the both of them."

¶ 27 The victim's testimony established that she trusted and confided in the defendant. In May 2015, when she was 12 years old, she was having a rough day when the defendant mentioned a "counseling thing" that he thought would help her. He said, "he would treat [her] like a baby and [they] would do baby things." Although she was apprehensive, she wanted to believe the alleged sessions were helping her as the defendant insisted. During the encounters, which took place in his bedroom, the defendant took off the victim's pants and undergarments, wiped her vagina with a baby wipe, sprinkled baby powder on her, and

put a diaper on her. This happened approximately 10 times. When she wore a diaper, he would cradle her in his arms and feed her soda with a baby bottle. He would also wipe her vagina when he took off her diaper.

¶ 28 On one occasion, the defendant told the victim to take off her shirt because he wanted her completely naked. She did not want to, but he insisted that it was okay and said she was beautiful. He kept asking, so she let him take off her shirt. He then hugged her and again said she was beautiful. She slept in a crib in his room that night.

¶ 29 In his defense, the defendant attempted to downplay the sexual nature of his diaper fetish. He testified that he recommended wearing diapers to the victim for alleged therapeutic purposes. He insisted that he did not want to overstep any boundaries and always asked the victim if she felt comfortable. He testified that he did not engage in this activity for arousal, but because the victim was depressed, and he thought it would help. He testified that when he was by himself wearing a diaper, he was not sexually aroused, did not view pornography, did not sexually stimulate himself, and did not use any sex toys. He testified that he did not wear a diaper during any kind of sexual activity with his adult sexual partners. He also claimed that he only used the Fetlife website to talk to other people interested in diaper play, not for sexual purposes.

¶ 30 However, the defendant admitted on cross-examination that portions of his trial testimony varied from what he had previously told officers. In fact, the defendant's story had already changed throughout the duration of his interview. He admitted taking the victim's clothes off. He also admitted wiping her vagina with a baby wipe, although he claimed that it only happened once. The defendant had all but one of his past girlfriends

11

wear diapers, and he had sexual relations with each of them. He confirmed that, during his interview, he said he was aroused during his interactions with the victim. Although the defendant attempted to downplay the extent of his erection, he admitted that his testimony on this issue was different from what he told the police during his interview.

¶ 31 Having considered the totality of the evidence, and having conducted a qualitative, commonsense assessment of that evidence within the context of this case, we do not find that the evidence was closely balanced. Rather, we conclude that the evidence of the defendant's guilt was overwhelming. Accordingly, the defendant has failed to establish that the trial court's failure to comply with Rule 431(b) constituted plain error.

¶ 32 Although we have concluded that plain-error relief is not appropriate in this case, we find it important to note that the issue of trial courts failing to comply with Rule 431(b) has needlessly plagued Illinois reviewing courts for decades. *People v. Neal*, 2020 IL App (4th) 170869, ¶¶ 191-93. We say "needlessly" because avoiding this issue entirely could not be easier. *Id.* ¶ 190. Trial courts' failure to strictly comply is all the more perplexing given the very serious interests at stake. See *id.* ¶ 197 (describing what a prosecutor must say to a victim after a conviction has been reversed, including that retrial may not be possible). We reiterate that trial courts should strictly adhere to the precise language the Illinois Supreme Court requires in Rule 431(b).

¶ 33                                III. CONCLUSION

¶ 34 Therefore, we affirm the judgment of the circuit court of Effingham County.


¶ 35 Affirmed.

12